# In the United States Court of Federal Claims

No. 06-741 T
(Filed: February 27, 2009)

```
*************************************
STRATEGIC HOUSING FINANCE          *
CORPORATION OF TRAVIS COUNTY,      *      Subject Matter Jurisdiction; RCFC 12(b)(1);
                                   *      RCFC 12(b)(6); Fifth Amendment Takings
                 Plaintiff,        *      Claim; Illegal Exaction Claim; Arbitrage
                                   *      Bonds; Rebate of Arbitrage Profits;
v.                                 *      26 U.S.C. § 148(f); 26 U.S.C. § 7422(a);
                                   *      Clintwood Elkhorn Mining Co.; Pennoni I;
THE UNITED STATES,                 *      Pennoni II; In re Air Transportation Excise
                                   *      Tax Litigation
                 Defendant.        *
*************************************
```

Wm. Mark Scott, Washington, DC, for plaintiff.

Jacob E. Christensen, United States Department of Justice, Washington, DC, for defendant.
Mary M. Abate, of counsel.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court is defendant's motion to dismiss for lack of subject matter jurisdiction, filed pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), and, alternatively, its motion to dismiss for failure to state a claim upon which relief can be granted, filed pursuant to RCFC 12(b)(6), related to plaintiff's claims asserted under the takings clause of the Fifth Amendment to the United States Constitution ("Constitution").[1]  In this action, plaintiff Strategic Housing Finance Corporation of Travis County, an issuer of tax-exempt bonds, seeks recovery of $267,440.00 in arbitrage rebate that it remitted to the Internal Revenue Service ("IRS") in accordance with the Internal Revenue Code ("IRC") and regulations promulgated thereunder.  According to plaintiff, it overpaid the amount of arbitrage rebate and is entitled to a refund because the IRS required it to make payment more than four years before any payment was due.  The IRS's conduct, plaintiff alleges, constitutes an illegal exaction and an illegal taking of its property.  Defendant contends that the court lacks jurisdiction to entertain plaintiff's amended complaint because plaintiff failed to exhaust prescribed administrative

---

[1]  Before defendant filed the instant motion, it filed, as discussed in Part I.C, infra, an RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief could be granted.

remedies before it instituted this action.  The court determines that oral argument is unnecessary and, for the reasons discussed below, grants defendant's RCFC 12(b)(1) motion and denies as moot defendant's RCFC 12(b)(6) motion.

## I.  BACKGROUND

### A.  Arbitrage Bonds

This case involves the tax-exempt status of certain types of bonds.  The IRC provides that interest earned on state and local government bonds is generally excluded from bondholders' gross income.[2]  26 U.S.C. § 103(a) (2006).  This interest, therefore, is not taxable to the bondholders.  Id.  As a result, the exclusion set forth in section 103(a) "enables state and local governments to issue, and sell to investors, bonds paying lower interest rates than those of other issuers, and thereby to finance their governmental activities at significantly less cost."  Mot. United States Dismiss Compl. Lack Subject Matter Jurisdiction ("Def.'s Mot.") 2.  The tax exclusion set forth in section 103(a), however, does not apply to interest on "arbitrage bonds." 26 U.S.C. § 103(b)(2).

An arbitrage bond, for purposes of section 103 of the IRC,

means any bond issued as part of an issue of any portion of the proceeds of which are reasonably expected (at the time of the issuance of the bond) to be used directly or indirectly–
   (1) to acquire higher yielding investments, or
   (2) to replace funds which were used directly or indirectly to acquire higher yielding investments.
For purposes of this subsection, a bond shall be treated as an arbitrage bond if the issuer intentionally uses any portion of the proceeds of the issue of which such bond is a part in a manner described in paragraph (1) or (2).

Id. § 148(a).  In other words, "[a]rbitrage bonds generally are obligations issued to acquire other securities where the rate of return of other securities produces a higher yield than the interest cost on the initial bond issue."  S. Rep. No. 91-552, at 219, reprinted in 1969 U.S.C.C.A.N. at 2254. An issuer of arbitrage bonds "earns arbitrage profits by investing the proceeds of the sale of tax-exempt bonds in investments that earn a higher yield than the interest (yield) paid by the issuer to the purchasers of its bonds (the bondholders)."  Def.'s Mot. 3.

---

[2]  This exemption "has been provided ever since the Federal income tax was adopted in 1913."  S. Rep. No. 91-552, at 218 (1969), reprinted in 1969 U.S.C.C.A.N. 2027, 2252.

In 1969, the United States Senate recognized that

> [s]ome State and local governments have misused their tax exemption privilege
> by engaging in arbitrage transactions in which the funds from the tax-exempt
> issues are employed to purchase higher yielding Federal or other obligations[,] the
> interest on which is not taxed in their hands. . . .  The tax-exempt issue in these
> cases generally specifies that the interest on the Federal bonds or other obligations
> will be used to service the State and local securities.  An individual who purchases
> a State or local security under such an arbitrage arrangement has the advantage of
> a tax-exempt security with the safety of a Federal security.  The Federal
> Government then finds itself in the position of becoming an unintended source of
> revenue for State and local governments while losing the opportunity to tax the
> interest income from its own taxable bond issues.

S. Rep. No. 91-552, at 219, reprinted in 1969 U.S.C.C.A.N. at 2254.  Consequently, Congress, in
the Tax Reform Act of 1969, Pub. L. No. 91-172, 83 Stat. 487, denied tax-exempt status to
arbitrage bonds in an attempt to eliminate the incentive for issuers to earn arbitrage at the
expense of the United States and to ensure that state and local governments did not earn
additional revenue for purposes unrelated to the purpose for which the bonds were issued at the
expense of the federal government.  See S. Rep. No. 91-552, at 219-20, reprinted in 1969
U.S.C.C.A.N. at 2254.

　　　Prior to 1980, the IRC did not provide for an issuer of arbitrage bonds to disgorge
arbitrage profits.  Congress enacted the Omnibus Reconciliation Act of 1980, Pub. L. No. 96-
499, 94 Stat. 2599, which amended the IRC to allow for issuers of tax-exempt mortgage subsidy
bonds to maintain the bonds' tax-exempt status by paying arbitrage to the mortgagors.[3]  Shortly
thereafter, Congress again amended the IRC to allow issuers to elect to pay arbitrage profits to
the United States, rather than to the mortgagor.[4]  See Act of Dec. 24, 1980, Pub. L. No. 96-595,

---

[3]  The 1980 Act added section 103A to the IRC, which applied only to mortgage subsidy
bonds.  Subsection (i), "Requirements related to arbitrage," set forth requirements, in addition to
those already contained in section 103(c), that must be satisfied in order for these bonds to retain
their tax-exempt status.  See 26 U.S.C. § 103A(i) (Supp. V 1981).  For example, paragraph
(4)(A)(ii) of section 103A(i) provided that arbitrage "shall be paid or credited to the mortgagors
as rapidly as may be practicable."

[4]  As amended, section 103A(i)(4)(D) provided:

> 　　　Subparagraph (A) shall be satisfied with respect to any issue if the issuer
> elects before issuing the obligations to pay over to the United States–
> 　　　　　(i) not less frequently than once each 5 years after the date of issue,
> an amount equal to 90 percent of the aggregate amount which would be
> required to be paid or credited to mortgagors under subparagraph (A) (and

94 Stat. 3464.  The Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494, applied similar arbitrage rebate rules to industrial development bonds, which were eligible for tax-exempt status if the issuers paid arbitrage profits to the United States.[5]

When it enacted the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, "Congress effected major revisions of the [IRC] . . . ."  United States v. Carlton, 512 U.S. 26, 28 (1994).  Relevant here, the 1986 Act repealed most of the provisions set forth in section 103, repealed section 103A entirely, and added sections 141 through 150.  Sections 141 through 150 prescribed tax exemption requirements for state and local bonds.  Rules relating to arbitrage were moved to section 148, and Congress "extended the arbitrage restrictions and rebate rules to all tax-exempt bonds . . . ."  Def.'s Mot. 3 n.6; see also Pl.'s Am. Mem. Opp'n Def.'s Mot. ("Pl.'s

---

    not theretofore paid to the United States), and
        (ii) not later than 30 days after the redemption of the last
    obligation, 100 percent of such aggregate amount not theretofore paid to
    the United States.

26 U.S.C. § 103A(i)(4)(D)(i)-(ii) (Supp. V 1981).

   [5]  The 1984 Act amended section 103(c) of the IRC to incorporate industrial development bonds as follows:

    (D) Rebate to United States.  –An issue shall be treated as meeting the
    requirements of this subparagraph only if an amount equal to the sum of–
        (i) the excess of–
            (I) the aggregate amount earned on all nonpurpose obligations
        (other than investments attributable to an excess described in this clause),
        over
            (II) the amount which would have been earned if all nonpurpose
        obligations were invested at a rate equal to the yield on the issue, plus
        (ii) any income attributable to the excess described in clause (i),
    is paid to the United States by the issuer in accordance with the requirements of
    subparagraph (E).

26 U.S.C. § 103(c)(6)(D) (Supp. III 1982).  Subparagraph (E) set forth that the amount required to be paid to the United States "shall be paid in installments which are made at least once every 5 years."  Id. § 103(c)(6)(E).  Each installment "shall be in an amount which insures that 90 percent of the amount described in subparagraph (D) with respect to the issue at the time payment of such installment is required will have been paid to the United States."  Id.  Subparagraph (E) also required that the "last installment shall be made no later than 30 days after the day on which the last obligation of the issue is redeemed . . . ."  Id.  The Secretary of the United States Department of the Treasury ("Secretary") was directed to prescribe regulations necessary to carry out the purposes of the subsection.  Id. § 103(c)(7).

Am. Opp'n") 4 (stating that "[i]n 1986, Congress significantly expanded the scope of the previously-existing arbitrage restrictions as one of many means to curb the growth in issuance of tax-exempt bonds").  By enacting the 1986 Act, Congress recognized that

> arbitrage is a device for concealing the true cost of a bond-financed facility from the public, since in lieu of directly requesting additional bond authority (which the public might not approve), the issuer uses an indirect Federal Government subsidy (i.e., arbitrage profits) to underwrite a portion of the cost.  Also, when allowable non-essential function bond volume is limited as under the bill, arbitrage profits may serve as a device through which projects are financed in excess of the allowable volume.

H.R. Rep. No. 99-426, at 517 (1986), reprinted in 1986-3 C.B. 1, 517.  Plaintiff estimates that the federal government, as a result of these changes, "collects tens to hundreds of millions in arbitrage rebate yearly from hundreds of governmental issuers."  Pl.'s Am. Opp'n 4; Pl.'s Supplemental Mem. ("Pl.'s Supp'l Mem.") 1; see also Pl.'s Am. Opp'n 4 n.4 (stating that the government collected approximately $258 million, $172 million, and $66 million in arbitrage rebate in 1999, 2000, and 2001, respectively).

> Section 148 of the IRC sets forth detailed rules for rebate of arbitrage and was enacted in order

> to minimize the arbitrage benefits from investing gross proceeds of tax-exempt bonds in higher yielding investments and to remove the arbitrage incentives to issue more bonds, to issue bonds earlier, or to leave bonds outstanding longer than is otherwise reasonably necessary to accomplish the governmental purposes for which the bonds were issued.

Treas. Reg. § 1.148-0(a) (as amended in 2003).  Section 148, therefore, "requires that certain earnings on higher yielding investments be rebated to the United States."  Id.  Pursuant to section 148(f)(1), "[a] bond which is part of an issue shall be treated as an arbitrage bond if the requirements of paragraphs (2) and (3) are not met with respect to such issue."[6]  26 U.S.C. § 148(f)(1).  Paragraph (2), which pertains to rebate to the United States, provides:

> An issue shall be treated as meeting the requirements of this paragraph only if an amount equal to the sum of–
> (A) the excess of–
> (i) the amount earned on all nonpurpose investments (other than investments attributable to an excess described in this subparagraph), over
> (ii) the amount which would have been earned if such nonpurpose

---

[6]  This treatment does not apply to any qualified veterans' mortgage bonds.  26 U.S.C. § 148(f)(1) (2006).

investments were invested at a rate equal to the yield on the issue, plus
(B) any income attributable to the excess described in subparagraph (A),
is paid to the United States by the issuer in accordance with the requirements of
paragraph (3).

Id. § 148(f)(2).  Paragraph (3), which governs the due dates for arbitrage rebate, provides, in part:

Except to the extent provided by the Secretary, the amount which is
required to be paid to the United States by the issuer shall be paid in installments
which are made at least once every 5 years.  Each installment shall be in an
amount which ensures that 90 percent of the amount described in paragraph (2)
with respect to the issue at the time payment of such installment is required will
have been paid to the United States.  The last installment shall be made no later
than 60 days after the day on which the last bond of the issue is redeemed and
shall be in an amount sufficient to pay the remaining balance of the amount
described in paragraph (2) with respect to such issue.

Id. § 148(f)(3).

The United States generally receives arbitrage rebate "'voluntarily' from State and local
governments, but also performs hundreds of bond examinations per year[,] many of which target
the arbitrage rebate requirement and result in enforced remittances of arbitrage rebate."  Pl.'s
Supp'l Mem. 1.  Plaintiff's use of the term "voluntary" does not suggests that an issuer has
unfettered discretion to remit arbitrage rebate to the United States.[7]  Section 148(f) requires
issuers of tax-exempt bonds either to rebate arbitrage profits arising from a bond issue or to
accept the loss of the bond issue's tax-exempt status.  See 26 U.S.C. § 148(f); Treas. Reg.
§ 1.148-0 ("Violation of these provisions causes the bonds in the issue to become arbitrage
bonds, the interest on which is not excluable from the gross income of the owners under section
103(a).").  The Secretary, however, has discretion, pursuant to section 148(f)(7), to impose a
penalty in lieu of a loss of tax-exempt status.  See 26 U.S.C. § 148(f)(7); see also Treas. Reg.
§ 1.148-3(h)(1) (as amended in 1997) (providing that the failure to pay the correct rebate amount
will not cause the bonds to become arbitrage bonds if the Commissioner of Internal Revenue
("Commissioner") "determines that the failure was not caused by willful neglect and the issuer
promptly pays a penalty to the United States").

---

[7]  Plaintiff notes that while it voluntarily accepted a condition to remit arbitrage rebate
when it issued the bonds, it "had no realistic discretion as to whether to make rebate remittance
under the Federal government's 'carrot and stick' approach to tax-exempt bonds" because it
"made its remittance pursuant to a particularly heavy and fast-swinging 'stick' of threats from
Federal agents."  Pl.'s Am. Opp'n 17; see also id. at 15 ("State and local governments are under
significant 'business compulsion' to remit arbitrage in the amount demanded by the IRS.").

Section 148(i) requires that the Secretary "prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section." 26 U.S.C. § 148(i); see also Treas. Reg. §§ 1.148-0 to 1.148-11 (containing the regulations promulgated by the Secretary). Treasury Regulation 1.148-3(i) governs the recovery of an overpayment of rebate, and an issuer may recover an overpayment for an issue of tax-exempt bonds "by establishing to the satisfaction of the Commissioner that the overpayment occurred." Treas. Reg. § 1.148-3(i)(1); see also id. § 1.148-3(2)(i)-(ii) (establishing limitations on recovery of overpayment). Additionally, Treasury Regulation 1.148-10 establishes broad anti-abuse rules and confers upon the Commissioner the authority to take specific actions that ensure that the purposes of section 148 are effectuated. See Treas. Reg. § 1.148-10 (as amended in 1997). One such rule authorizes the Commissioner to require an earlier date for payment of rebate:

> If the Commissioner determines than an issue is likely to fail to meet the requirements of [section] 1.148-3 and that a failure to serve a notice of demand for payment on the issuer will jeopardize the assessment or collection of tax on interest paid or to be paid on the issue, the date that the Commissioner serves notice on the issuer is treated as a required computation date for payment of rebate for that issue.

Id. § 1.148-10(f).

On June 24, 2008, the IRS released Revenue Procedure 2008-37, which sets forth a deadline for bond issuers to file an administrative claim to recover overpayments of arbitrage rebate and explains procedures relating to these claims.[8] See Rev. Proc. 2008-37, 2008-29 I.R.B.

---

[8] Revenue Procedure 2008-37 rendered Revenue Procedure 92-83, 1992-42 I.R.B. 29, obsolete. Rev. Proc. 2008-37, § 4, 2008-29 I.R.B. 137. Section 3 of Revenue Procedure 2008-37

> sets forth terms and procedures for filing claims for recovery of an overpayment of rebate, penalty, or yield reduction with respect to an issue (an overpayment amount). In order to receive any recovery of an overpayment amount, an issuer must duly file a claim for recovery of an overpayment amount (a refund claim) on the then-applicable form (form) and at the then-applicable place of filing . . . . Presently, a refund claim shall be made by completing Form 8038-R . . . .

Id. § 3.01. Revenue Procedure 2008-37 also states that 26 U.S.C. § 7422 applies to claims with respect to overpayments of rebate. Id. § 2.11. As noted in Part I.C., infra, the parties briefed what impact, if any, Revenue Procedure 2008-37 had upon these proceedings. Plaintiff asserts that Revenue Procedure 2008-37 is "inconsequential" because it is "based on the assumption that arbitrage rebate is not a tax," which plaintiff disputes. Pl.'s 2d Supplemental Opening Br. ("Pl.'s 2d Supp'l Br.") 3. Although it does not rely upon Revenue Procedure 2008-37, defendant emphasizes that "it is consistent with our arguments already briefed to the Court" and "simply

137.  Refund claims for an overpayment amount must be filed by an issuer no later than the date that is two years after the final computation date for the applicable issue of bonds.  See id. § 3.02.  However, "[f]or refund claims arising from an issue of bonds for which the final computation date is on or before June 24, 2008[,] the two year period . . . begins on July 1, 2008."  Id. § 6.02.  Once a refund claim has been filed, the IRS Office of Tax Exempt Bonds, Compliance and Program Management ("TEB") processes the claim and determines whether an overpayment occurred and the amount of the overpayment that an issuer may recover.  Id. § 3.03(1)-(2).  The TEB may deny a refund claim because (1) the correct amount of overpayment is less than the requested overpayment amounts, or (2) no overpayment occurred.  Id. § 3.03(2)(c).  Once the TEB makes a preliminary determination that a refund claim should be denied, the issuer has an opportunity to submit, within a prescribed period of time, additional information to support its claim.  Id.  If the issuer fails to do so within the time limitation or if the TEB disagrees that an overpayment occurred, then the TEB "will issue . . . a formal letter to the issuer stating that the refund claim is denied (a Refund Claim Denial), subject only to the issuer's appeal right . . . ."[9]  Id.  An issuer's appeal of the TEB's denial may be initiated pursuant to Revenue Procedure 2006-40, 2006-42 I.R.B. 694.  See Rev. Proc. 2008-37, § 3.04, 2008-29 I.R.B. 137.

Revenue Procedure 2006-40 sets forth procedures for an issuer of tax-exempt bonds to request an administrative appeal from the TEB's denial for recovery of an asserted overpayment of arbitrage rebate.  See Rev. Proc. 2006-40, 2006-42 I.R.B. 694.  The appeal process is available with respect to

> [a]ny issue raised by TEB in a Proposed Adverse Determination that would cause interest on a bond issue to fail to qualify for the exclusion from gross income under section 103 of the Code or any Arbitrage Rebate Claim Denial that involves a denial by TEB of a claim for recovery of arbitrage rebate payments under section 148 of the [IRC] with respect to a bond issue . . . .

Id. § 3.01.  The appeal rights, however, are "not available to an issuer prior to the receipt of either such a Proposed Adverse Determination or an Arbitrage Rebate Claim Denial."  Id. § 4.02.  An appeal must be submitted "in writing to TEB within 30 days of the date of TEB's Proposed Adverse Determination or Arbitrage Rebate Claim Denial."  Id. § 4.03.  Failure to initiate an appeal request within the prescribed time frame and in accordance with IRS procedures results in the Proposed Adverse Determination or Arbitrage Rebate Claim Denial becoming final.  Id. § 4.06.  Once final, the interest on the bonds at issue "will no longer be treated as excludable from gross income under section 103 of the [IRC] and TEB may initiate procedures to impose

---

updates the guidance already issued by the IRS . . . ."  Def.'s Resp. Pl.'s 2d Supplemental Br. ("Def.'s Resp. Pl.'s 2d Supp'l Br.") 3

[9] A "Refund Claim Denial" triggers an issuer's right to appeal.  Rev. Proc. 2008-37, § 3.03(2)(c), 2008-29 I.R.B. 137.  The issuer cannot appeal a refund claim that the TEB "reject[s] on the basis of a procedural deficiency or incomplete information . . . ."  Id. § 3.03(2)(b).

tax on the bondholders with respect to the interest on the bonds." Id. § 6.  The procedures set forth in Revenue Procedure 2006-40 took effect on September 27, 2006, id. § 9, slightly more than one month before plaintiff filed its complaint.

## B.  Plaintiff's Bonds and Payment of Arbitrage Rebate

Plaintiff, a public nonprofit housing finance corporation organized pursuant to the laws of Texas, Am. Compl. ¶ 7, was established "for the purpose of providing a means of financing the costs of residential developments that will provide decent, safe, and sanitary housing for persons of low and moderate income," Def.'s Mot. App. B, Ex. 1 at B-3.[10]  In September 2004, plaintiff issued bonds with a total face value of $35 million in order to finance a "lease-to-own" program operated in conjunction with the Federal Home Loan Mortgage Corporation, commonly known as Freddie Mac.[11]  Am. Compl. ¶ 11.  This program advances home ownership opportunities for low- and moderate-income residents of Travis County, Texas.  Id.  According to plaintiff, the program provided 150 prospective home buyers, who were previously deemed "'credit impaired' or lacked sufficient credit history to purchase a home on their own," a period of time during which they could establish or reestablish their credit while living in a home of their choice.  Id.

Plaintiff alleges that its bond issue included "an official statement indicating to the purchasers . . . that interest paid on the Bonds could be excluded from gross income for federal income tax purposes."  Id. ¶ 10.  According to plaintiff, this statement was made based upon "an opinion of special tax counsel . . . to the effect that interest paid on the Bonds would be excludible from gross income under the provisions of section 103 of the [IRC]."  Id.  Although plaintiff sought the advice of tax counsel, it did not request an advance ruling from the IRS that its bonds would qualify for tax-exempt status before it issued the bonds.  Def.'s Mot. App. C ¶ 3.[12]  Plaintiff alleges that pursuant to the IRC and IRS regulations, "the first date [it] would have been required to remit arbitrage rebate to the IRS would have been . . . November 30, 2010."  Am. Compl. ¶ 16.

After plaintiff issued the bonds, "the IRS initiated an audit to determine plaintiff's compliance with the provisions of the [IRC] that relate to issues of tax-exempt bonds."  Def.'s Mot. 5; see also Am. Compl. ¶ 17 (alleging that the IRS was "actively examining the Bond transaction for purposes of determining compliance with the provisions of the [IRC]").  On May 31, 2006, the IRS notified plaintiff of potential arbitrage violations with respect to the bonds.

---

[10]  Defendant's Appendix B contains a declaration of its counsel, Jacob Christensen, to which five exhibits are attached.  See Def.'s Mot. App. B, Exs. 1-5.

[11]  Defendant states that the bonds were issued on October 13, 2004, rather than on September 1, 2004, as alleged in the amended complaint.  Def.'s Mot. 5 n.8.

[12]  Defendant's Appendix C contains a declaration of Clifford Gannet, Director of the Tax Exempt Bonds function of the IRS.  See Def.'s Mot. App. C.

See Def.'s Mot. App. B, Ex. 2 at B-4 ("Although our current examination of your lease to own home ownership program has primarily focused on structural problems potentially altering the bonds' tax status, we are also developing concerns about various arbitrage issues impacting the bonds."); see also Am. Compl. ¶ 18 (alleging that the IRS's May 31, 2006 letter contained "blanket assertions" about the "existence of . . . facts [that] would call into question whether certain payments made with respect to a guarantee of the principal and interest payments on the Bonds should be treated as payments made with respect to a qualified guarantee of the Bonds"). Thereafter, on June 26, 2006, the IRS issued a jeopardy notice to plaintiff.[13]  Def.'s Mot. App. B, Ex. 3 at B-6 to B-7.  In this notice, the IRS required that plaintiff utilize June 26, 2006, as "the computation date for payment of rebate."  Id. at B-6; accord Am. Compl. ¶ 19.  The notice informed plaintiff that pursuant to Treasury Regulation 1.148-3(g), its rebate payment was due within sixty days after the computation date to which the payment related.  Def.'s Mot. App. B, Ex. 3 at B-6.  Since the IRS required that plaintiff utilize June 26, 2006, as the computation date, see id., plaintiff's payment was due on August 25, 2006, Def.'s Mot. 5.

Because the June 26, 2006 notice "did not enumerate a specific dollar amount of arbitrage rebate due[,] . . . plaintiff hired outside experts to compute the amount of rebate owed pursuant to its own interpretation of the Jeopardy Notice and existing legal authority."  Am. Compl. ¶ 21. These computations resulted in a calculation of $267,444.00.[14]  Id.  But see id. ¶ 22 (alleging that "[w]hen the same experts followed the guidelines provided to plaintiff by their special tax counsel and included the same payments as qualified guarantee payments, the rebate computation for the same period resulted in negative arbitrage in the amount of ($229,060.43)").  Plaintiff paid arbitrage rebate to the government on September 21, 2006,[15] Def.'s Mot. 5, and indicated on its enclosed IRS Form 8038-T that its "remittance was specifically made under protest with all rights reserved," Am. Compl. ¶ 3; see also Def.'s Mot. App. B, Ex. 4 at B-8 (containing a copy of plaintiff's IRS Form 8038-T with typewritten notations that the arbitrage rebate was "paid under protest" with "all rights reserved").

Plaintiff alleges that "normal jeopardy or termination provisions, generally applicable to other taxpayers, . . . have not been made available" to it.  Am. Compl. ¶ 25.  It also alleges that

---

[13]  The June 26, 2006 notice indicated that it was sent pursuant to the authority granted in Treasury Regulation 1.148-10(f) and explained the grounds upon which the demand for payment of rebate were based.  See Def.'s Mot. App. B, Ex. 3 at B-6 to B-7.  Plaintiff, however, challenges whether the notice was issued with prior review or concurrence by the IRS Office of Chief Counsel.  See Am. Compl. ¶ 27.

[14]  According to plaintiff, it was required to remit only ninety percent, or $240,699.60, of the total amount of $267,440.00 that was due pursuant to 26 U.S.C. § 148(f)(3).  Pl.'s Am. Opp'n 21.  Instead, it "intentionally remitted 100 percent of this amount, $267,444.00," id., which was "more than the minimum amount 'owed' pursuant to its calculation," id. at 21 n.29.

[15]  The IRS granted plaintiff's requests for extensions of time.  Am. Compl. ¶ 3.

"[n]o administrative remedies exist for issuers, such as plaintiff, to contest the merits of any IRS determination prior to the deadline for making an early remittance of arbitrage rebate." Id. ¶ 28; see also id. ¶ 29 (alleging that the IRS "has also not issued any administrative remedies that would afford municipal issuers, such as plaintiff, a timely, third-party review of the IRS jeopardy determination after a remittance of a jeopardy rebate amount is made"). As of the date of remittance, plaintiff alleges that the IRS "never progressed beyond the initial stages of its audit" and failed to issue "either a 'preliminary adverse determination letter' or a 'proposed adverse determination letter,' as those terms are used in the IRS examination procedures for municipal bonds." Id. ¶ 17. Plaintiff also alleges that the IRS "has not taken any affirmative steps to progress beyond the initial stages of the audit since the remittance was made or the filing of this action." Id. Furthermore, according to plaintiff, the IRS never provided "any substantiation, theory[,] or rationale to support its finding of jeopardy with respect to its ability to collect tax from the holders or prior holders of the Bonds." Id. ¶ 20.

Plaintiff's amended complaint contains three counts.[16] In count one, plaintiff alleges that the IRS's conduct, which plaintiff contends "result[ed] in a required early remittance of a disputed amount, without any opportunity to refute, challenge or contest key findings prior to the payment thereof, constitutes an illegal exaction by the IRS and an illegal taking of plaintiff's property" without just compensation and a deprivation of property without due process in violation of the Fifth Amendment.[17] Id. ¶ 38. In count two, plaintiff alleges that the IRS arbitrarily determined–and failed to document or support a finding–that the failure to serve the June 26, 2006 notice would jeopardize the assessment or collection of tax on interest paid or to be paid on plaintiff's bonds. Id. ¶ 41. In count three, plaintiff alleges that the arbitrage rebate remitted to the IRS constitutes an "immediately refundable deposit as a matter of law." Id. ¶ 43. Plaintiff seeks the recovery of $267,444.00 in arbitrage rebate that it remitted to the IRS, see id. ¶¶ 39(4), 41(2), 43(2), and requests that the court "require the IRS to share bondholder information," id. ¶ 41(1).

## C. Procedural History

On October 31, 2006, one month after it paid arbitrage rebate to the United States, plaintiff instituted this action in the United States Court of Federal Claims ("Court of Federal Claims"). It did so without first filing a refund claim with the IRS.[18] See Def.'s Mot. App. C ¶ 3

---

[16] As noted in Part I.C, infra, the court granted plaintiff's motion to amend its complaint.

[17] In support of count one, plaintiff alleges that Treasury Regulation 1.148-10(f) is invalid as a matter of law and that the IRS failed to properly delegate authority for the purpose of determining jeopardy. Am. Compl. ¶¶ 35-36.

[18] In its opposition brief, plaintiff indicates that it filed an administrative claim with the IRS "several months ago to start the 6-month period under [26 U.S.C.] § 6532," but asserts that it "has not asked to withdraw this action . . . as there is no guarantee that the Defendant will not,

(stating that plaintiff "did not submit an administrative request to the [IRS] for recovery of arbitrage rebate it paid with respect to the bonds at issue in this suit"). On June 6, 2007, defendant filed an RCFC 12(b)(6) motion in which it argued that the case was "not appropriate for judicial review because plaintiff failed to exhaust its administrative remedies with the IRS prior to bringing this suit to recover the claimed overpayment of arbitrage rebate."[19] Def.'s RCFC 12(b)(6) Mot. 19. The court scheduled oral argument once briefing on defendant's RCFC 12(b)(6) motion concluded.

Before the court heard argument on defendant's RCFC 12(b)(6) motion, defendant filed a motion to postpone oral argument and to permit supplemental briefing "on a related threshold jurisdiction issue–i.e., that the complaint in this case is jurisdictionally defective under 26 U.S.C. § 7422(a) because plaintiff failed to file an administrative claim for refund prior to initiating this action."[20] Def.'s Mot. Continue & Permit Supp'l Br'g 1. Over plaintiff's objections, see Pl.'s Resp. Def.'s Mot. Continue & Permit Supp'l Br'g 2-3 (arguing, inter alia, that defendant should have joined its RCFC 12(b)(1) and 12(b)(6) motions and that defendant's assertions concerning the court's subject matter jurisdiction were "immaterial and irrelevant"), the court granted defendant's motion to postpone oral argument and to permit supplemental briefing, see Order, Sept. 21, 2007, at 1 ("While the court is sympathetic to plaintiff's desire to proceed

---

once again, change its position upon such a re-filing." Pl.'s Am. Opp'n 33 n.38; see also Def.'s Reply App. A, Ex. 2 (containing plaintiff's December 14, 2007 "re-submission" of its IRS Form 8038-R, which was a copy of its original claim filed "on or about September 28, 2007").

[19] In its RCFC 12(b)(6) motion, defendant suggested that because plaintiff did not file a refund claim, the court "may wish to examine its own jurisdiction over this action." Mot. United States Dismiss Compl. ("Def.'s RCFC 12(b)(6) Mot.") 25 n.18.

[20] Defendant explained the reason for its motion to postpone oral argument and to permit supplemental briefing:

> At the time that the briefs on our pending [RCFC 12(b)(6)] motion were filed, coordination among the Justice Department and components of the IRS Chief Counsel's office and the office of the Commissioner of IRS with respect to this jurisdictional issue–necessitated in part by the existence of an IRS technical advice memorandum (cited in the parties' briefs) that erroneously concluded that [section] 7422(a) does not apply to a request for the recovery of arbitrage rebate–was still ongoing. That process has now been completed, and we are preparing a supplemental motion and brief that will contend . . . that the Court lacks jurisdiction over the subject matter of the complaint, for failure to comply with the requirements of [section] 7422(a).

Mot. United States Continue Oral Argument Set Sept. 25, 2007, Permit Supplemental Briefing Related Threshold Jurisdictional Issue ("Def.'s Mot. Continue & Permit Supp'l Br'g") 2.

expeditiously, . . . [it] finds that in the interests of judicial efficiency and economy, the parties should address the jurisdictional issue raised by defendant . . . .").

On October 2, 2007, plaintiff filed a motion to amend its complaint pursuant to RCFC 15(a), which the court granted.  Thereafter, defendant filed the instant motion, and briefing proceeded forward on the jurisdictional issues raised therein.  As the parties were briefing defendant's RCFC 12(b)(1) motion, two decisions that the parties deemed pertinent to the instant case were issued.  Although plaintiff filed its opposition to the RCFC 12(b)(1) motion on December 5, 2007, it became aware of a December 4, 2007 Court of Federal Claims decision, Pennoni v. United States ("Pennoni I"), 79 Fed. Cl. 552 (2007), after it filed its opposition brief. The court granted plaintiff's motion to supplement its opposition brief, and plaintiff subsequently filed an amended brief.

After briefing concluded on defendant's RCFC 12(b)(1) motion, the United States Supreme Court ("Supreme Court") decided Clintwood Elkhorn Mining Co. v. United States, 128 S. Ct. 1511 (2008).  Consequently, the court directed the parties to indicate whether, in light of the Supreme Court's decision in Clintwood Elkhorn Mining Co., supplemental briefing was necessary.  Despite the parties' divergent views,[21] the court ordered supplemental briefing.  See Order, Apr. 18, 2008.

Shortly after supplemental briefing concluded, plaintiff filed a notice informing the court of the release of Revenue Procedure 2008-37, which referenced the Supreme Court's decision in Clintwood Elkhorn Mining Co.[22]  Plaintiff stated:

> If this court is inclined to grant either of Defendant's motions to dismiss, in whole or in part, based on the IRS's publication of these administrative

---

[21]  Defendant indicated that "briefing regarding the effect of Clintwood Elkhorn [Mining Co.] on this case is necessary . . . ."  Status Report United States Pursuant United States Court's Order Apr. 16, 2008, at 1.  Plaintiff, however, did not believe that additional briefing was necessary and indicated that it was "surprised by Defendant's failure to simply concede defeat on [the issue that a single refund scheme exists] after the . . . Supreme Court ruled unanimously in favor of a single refund scheme."  Pl.'s Resp. Mot. United States Leave File Unilateral Status Report 1.

[22]  Revenue Procedure 2008-37, as discussed in Part I.A, supra, provides "the terms and procedures for requesting . . . a recovery of overpayments of arbitrage rebate, penalty in lieu of rebate, and yield reduction paid to the United States under section 148 of the [IRC]."  Rev. Proc. 2008-37, 29 I.R.B. 137.  Revenue Procedure 2008-37 determined that section 7422 "applies to claims with respect to overpayments of rebate, penalty, and yield reduction because the amount of any such overpayment is covered within the 'any sum' language of [section] 7422."  Id.  It also provided that "the form for making a refund claim for an overpayment amount must be filed by an issuer no later than the date that is two years after the final computation date for the applicable issue of bonds . . . ."  Id.

procedures, Plaintiff respectfully requests this Court hold an oral argument on
same so as to provide Plaintiff an opportunity to address statutory and judicial
exhaustion questions . . . , and whether a judicial claim requirement should be
imposed when there remains an indefinite timeframe for administrative action.

Pl.'s Notice Recent IRS Action 1-2 (citation omitted).  The court determined that supplemental
briefing, rather than oral argument, was appropriate.  Accordingly, it directed the parties to file
briefs discussing the impact, if any, of Revenue Procedure 2008-37 upon these proceedings.  See
Order, July 9, 2008.  After the parties submitted a second round of supplemental briefs,
defendant's RCFC 12(b)(1) motion was fully briefed.  The case is now ripe for decision.

## II.  LEGAL STANDARDS

### A.  Jurisdiction

The Court of Federal Claims is a court of limited jurisdiction.  Jentoft v. United States,
450 F.3d 1342, 1349 (Fed. Cir. 2006) (citing United States v. King, 395 U.S. 1, 3 (1969)).  The
scope of this court's jurisdiction to entertain claims and grant relief depends upon the extent to
which the United States has waived its sovereign immunity.  King, 395 U.S. at 4.  In "construing
a statute waiving the sovereign immunity of the United States, great care must be taken not to
expand liability beyond that which was explicitly consented to by Congress."  Fid. Constr. Co. v.
United States, 700 F.2d 1379, 1387 (Fed. Cir. 1983).  A waiver of sovereign immunity "cannot
be implied but must be unequivocally expressed."  King, 395 U.S. at 4.  Unless Congress
consents to a cause of action against the United States, "there is no jurisdiction in the Court of
Claims more than in any other court to entertain suits against the United States."  United States v.
Sherwood, 312 U.S. 584, 587-88 (1941).

The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render
judgment upon any claim against the United States founded either upon the Constitution, or any
Act of Congress or any regulation of an executive department, or upon any express or implied
contract with the United States, or for liquidated or unliquidated damages in cases not sounding
in tort."  28 U.S.C. § 1491(a)(1) (2006).  Although the Tucker Act waives the sovereign
immunity of the United States for claims for money damages, it "itself does not create a
substantive cause of action; in order to come within the jurisdictional reach and the waiver of the
Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to
money damages."  Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in
part).  The separate source of substantive law must constitute a "money-mandating constitutional
provision, statute or regulation that has been violated, or an express or implied contract with the
United States."  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994)
(en banc).  "[I]n order for a claim against the United States founded on statute or regulation to be
successful, the provisions relied upon must contain language which could fairly be interpreted as
mandating recovery of compensation from the government."  Cummings v. United States, 17 Cl.
Ct. 475, 479 (1989) (citations omitted), aff'd, 904 F.2d 45 (Fed. Cir. 1990); see also United

States v. Testan, 424 U.S. 392, 398 (1976) (stating that a "grant of a right of action must be made with specificity").

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has described three types of underlying monetary claims that fall within the Tucker Act's waiver of sovereign immunity: claims (1) alleging the existence of a contract between the plaintiff and the government; (2) "where 'the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum'"; and (3) "where 'money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury.'" Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004) (quoting Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967)). Like tax refund claims, illegal exaction claims, which the United States Court of Claims ("Court of Claims") described as claims "where the Government has the citizen's money in its pocket," Clapp v. United States, 117 F. Supp. 576, 580 (Ct. Cl. 1954), fall within the second category.[23]  See Ontario Power Generation, Inc., 369 F.3d at 1301; see also Aerolineas Argentinas v. United States, 77 F.3d

_____

[23]  In Norman v. United States, the Federal Circuit explained that an illegal exaction

involves money that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  The classic illegal exaction claim is a tax refund suit alleging that taxes have been improperly collected or withheld by the government.  An illegal exaction involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution.  The Court of Federal Claims ordinarily lacks jurisdiction over due process claims under the Tucker Act, but has been held to have jurisdiction over illegal exaction claims "when the exaction is based upon an asserted statutory power."

429 F.3d 1081, 1095 (Fed. Cir. 2005) (citations omitted); see also Figueroa v. United States, 66 Fed. Cl. 139, 146 (2005) (defining illegal exaction claims as "those where the claimant seeks the return of all or part of a sum of money he has been improperly required to pay by the Government in contravention of the Constitution, a statute, or a regulation"), aff'd, 466 F.3d 1023 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 2248 (2007).  As the court in Evans v. United States observed, illegal exaction claims have several variations, including: (1) "[a] plaintiff may sue for a sum 'improperly exacted or retained' in violation of the Constitution, a statute, or a regulation," 74 Fed. Cl. 554, 565 (2006) (quoting Testan, 424 U.S. at 401); or (2) "a plaintiff may pursue an allegation that a 'particular provision of law relied upon grants [him], expressly or by implication, a right to be paid a certain sum' and that he has not been so paid," id. (quoting Eastport S.S. Corp., 372 F.2d at 1007).  In order to invoke Tucker Act jurisdiction over an illegal exaction claim, "a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  Norman, 429 F.3d at 1095 (quoting Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).

1564, 1572-73 (Fed. Cir. 1996) ("[T]he Tucker Act provides jurisdiction to recover the sums exacted illegally by [the Government] due to its misinterpretation or misapplication of statutes, regulations, or forms."); CNG Transmission Mgmt. VEBA v. United States, 84 Fed. Cl. 327, 328 (2008) ("This court's jurisdiction over plaintiff's tax refund claim is undisputed . . . ."); Radioshack Corp. v. United States, 82 Fed. Cl. 155, 158 (2008) ("This Court has jurisdiction to consider tax refund suits under 28 U.S.C. § 1491(a)(1)."). Notwithstanding the Tucker Act, the jurisdiction of the Court of Federal Claims "depends upon the extent to which the United States has waived its sovereign immunity." Myers v. United States, 50 Fed. Cl. 674, 682 (2001). "With respect to tax refund suits, the United States has waived its sovereign immunity only as articulated in the [IRC]." Radioshack Corp., 82 Fed. Cl. at 158 (citing Supreme Court precedent in United States v. Williams, 514 U.S. 527 (1995), United States v. Dalm, 494 U.S. 596 (1990), and Flora v. United States, 362 U.S. 145 (1960) ("Flora II"), aff'g 357 U.S. 63 (1958) ("Flora I")).

"A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims." Clintwood Elkhorn Mining Co., 128 S. Ct. at 1514; accord 28 U.S.C. § 1346(a)(1). Section 1346 of title 28 of the United States Code provides, in relevant part:

> (a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
>
> > (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected . . . .

28 U.S.C. § 1346(a)(1). In order for the court to assert jurisdiction over such a claim, however, a plaintiff must satisfy the requirements set forth in the IRC, which establishes a "scheme [that] provides that a claim for a refund must be filed with the [IRS] before suit can be brought, and establishes strict timeframes for filing such a claim." Clintwood Elkhorn Mining Co., 128 S. Ct. at 1514. In Flora II, the Supreme Court described section 1346 as the "keystone in a carefully articulated and quite complicated structure of tax laws." 362 U.S. at 157.

Section 7422(a) functions as a condition on the waiver of the federal government's sovereign immunity from tax refund suits. See Chi. Milwaukee Corp. v. United States, 40 F.3d 373, 375 (Fed. Cir. 1994). It provides:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected,

until a claim for refund or credit has been duly filed with the Secretary, according
to the provisions of law in that regard, and the regulations of the Secretary
established in pursuance thereof.

26 U.S.C. § 7422(a).  By requiring that a plaintiff first file a claim with the IRS that complies
with IRS regulations, section 7422(a) creates a jurisdictional prerequisite to filing a refund suit.
Chi. Milwaukee Corp., 40 F.3d at 374 (citing Burlington N., Inc. v. United States, 684 F.2d 866,
868 (Ct. Cl. 1982)).  This requirement, the Federal Circuit indicated, "'is designed both to
prevent surprise and to give adequate notice to the [IRS] of the nature of the claim and the
specific facts upon which it is predicated, thereby permitting an administrative investigation and
determination.'"  Computervision Corp. v. United States, 445 F.3d 1355, 1363 (Fed. Cir. 2006)
(quoting Alexander Proudfoot Co. v. United States, 454 F.2d 1379, 1383 (Ct. Cl. 1972)).

     In order to be "duly filed" under section 7422(a), a tax refund claim must comply with the
timing requirement set forth in 26 U.S.C. § 6511(a).  Section 6511(a) provides:

> Claim for credit or refund of an overpayment of any tax imposed by this title in
> respect of which tax the taxpayer is required to file a return shall be filed by the
> taxpayer within 3 years from the time the return was filed or 2 years from the time
> the tax was paid, whichever of such periods expires the later, or if no return was
> filed by the taxpayer, within 2 years from the time the tax was paid.

26 U.S.C. § 6511(a).  In Dalm, the Supreme Court emphasized that "unless a claim for refund of
a tax has been filed within the time limits imposed by [section] 6511(a), a suit for refund,
regardless of whether the tax is alleged to have been 'erroneously,' 'illegally,' or 'wrongfully
collected,' may not be maintained in any court."  494 U.S. at 602 (citing United States v. Kales,
314 U.S. 186, 193 (1941)) (citation omitted).

     Although the Court of Federal Claims possesses jurisdiction to entertain claims arising
under the Just Compensation Clause of the Fifth Amendment, the same cannot be said for the
Due Process Clause.  See, e.g., James v. Caldera, 159 F.3d 573, 581 (Fed. Cir. 1998) (stating that
it is "well established" that the Court of Federal Claims lacks jurisdiction over Fifth Amendment
due process claims because the Due Process Clause is not a money-mandating provision);
LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (indicating that the Due Process
Clause of the Fifth Amendment is an insufficient basis for jurisdiction because it "do[es] not
mandate payment of money by the government").  As explained above, illegal exaction claims
are one exception.  See Norman, 429 F.3d at 1095.

## B.  Motion to Dismiss–RCFC 12(b)(1)

     The court's "general power to adjudicate in specific areas of substantive law . . . is
properly raised by a [Rule] 12(b)(1) motion."  Palmer v. United States, 168 F.3d 1310, 1313
(Fed. Cir. 1999).  When considering an RCFC 12(b)(1) motion, the burden of establishing the

court's subject matter jurisdiction resides with the party seeking to invoke it.  See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936).  The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the nonmoving party.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); Reynolds, 846 F.2d at 747.  If the defendant or the court questions jurisdiction, then the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction.  See McNutt, 298 U.S. at 189.  In deliberating a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes.  See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.  If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim.  Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

### III.  DISCUSSION

Arbitrage rebate "can be complicated and involve a significant number of disputed variables."  Pl.'s Am. Opp'n 31.  Adding to the complication is the parties' dispute over what constitutes the central issue that the court must resolve.  Plaintiff, which contends that "IRS regulations do not portray the legal nature of arbitrage rebate remittances," Pl.'s Resp. Supplemental Br. United States ("Pl.'s Resp. Def.'s Supp'l Br.") 1, argues that defendant's RCFC 12(b)(1) motion raises "whether arbitrage rebate is a tax remitted by taxpayers and, therefore, subject to existing law governing tax refund procedures, or a nontax amount remitted by non-taxpayers."  Pl.'s Am. Opp'n 9-10; see also id. at 10 (contending that "the first and principal question to be answered by Defendant's motion is whether Plaintiff is a taxpayer who remitted a tax or a non-taxpayer who remitted a non-tax amount"); Pl.'s Sur-Reply Def.'s Mot. ("Pl.'s Sur-Reply") 4 ("Defining Plaintiff's remittance is important for purposes of determining how it should be treated in this proceeding.").  According to plaintiff, its status as either a "taxpayer" or "non-taxpayer" would yield "relatively easy decisions" either way:

> For instance, if Plaintiff remitted a nontax amount, then the overwhelming weight of authority supports a finding that the law governing tax refunds ([IRC section] 7422) does not apply to this proceeding.  If, on the other hand, Plaintiff remitted a tax amount, then the only question that remains is whether Plaintiff's remittance was a payment or a deposit, which, again, is a question that can be answered based on longstanding precedent.

Pl.'s Am. Opp'n 10.  Although it asserts that the court must address the classification of arbitrage rebate as either a "tax" or a "non-tax," plaintiff acknowledges that "[i]n the two instances in which the issue has been addressed in a court of law, neither court was required to directly

address and fully analyze whether arbitrage rebate is or is not a tax." Id. at 11 (citing City of Galt v. United States, 804 F. Supp. 1275 (E.D. Cal. 1992), and Government Finance Officers Ass'n v. United States, 680 F. Supp. 1538 (N.D. Ga. 1988)); accord Pl.'s Sur-Reply 5 n.5; see also Pl.'s 2d Supp'l Br. 3 ("[N]o court has defined arbitrage rebate, including neither the Federal Circuit nor the U.S. Supreme Court.").

Defendant, however, contends that the plain language of 26 U.S.C. § 7422(a) "requires that issuers file an administrative claim with the IRS prior to initiating suit to recover arbitrage rebate" and is central to the court's determination in this case.  Def.'s Mot. 9.  It asserts:

> [T]he fundamental issue to be decided by this Court . . . is whether Congress did not intend for a court to decide the question of a bond issuer's entitlement to recovery of a payment of arbitrage rebate, in the circumstances of this case–i.e., where plaintiff did not first file a refund claim with the [IRS] or otherwise exhaust its administrative remedies, and where the payment was an interim installment of rebate made pursuant to a discretionary determination by the Secretary, under [section] 148(f)(3), to accelerate the due date of the installment.

Reply United States Supp. Mot. Dismiss Compl. Lack Subject Matter Jurisdiction ("Def.'s Reply") 1-2.  Defendant argues that section 7422(a) is broad in scope and therefore encompasses arbitrage rebate.  Def.'s Mot. 8-11; Def.'s Reply 3.

### A.  The Court Need Not Determine Whether Arbitrage Rebate Constitutes a "Tax" or a "Non-Tax"

Plaintiff argues that the court "is in the unique position of having an opportunity to define arbitrage rebate," Pl.'s 2d Supp'l Br. 3, emphasizing the fact that "[t]here are no provisions within Title 26 that would define arbitrage rebate as a tax," Pl.'s Am. Opp'n 10.  It contends that a "tax" comprises two components: (1) an enforced contribution; (2) that is used for the support of government.[24] Id. at 12 (citing United States v. La Franca, 282 U.S. 568, 572 (1931)).

---

[24] Defendant argues that "[a]rbitrage rebate . . . neither is an 'enforced contribution' nor is its purpose to 'provide for the support of government.'"  Reply United States Pl.'s Supplemental Br. ("Def.'s Reply Pl.'s Supp'l Mem.") 5 n.3 (quoting Pl.'s Supp'l Mem. 9); accord id. at 4 ("[A]rbitrage rebate is not a 'tax' . . . .").  Rather, defendant asserts, a "fundamental characteristic of a tax is that it operates 'in invitum' and is 'capable of being enforced by action against the will of the taxpayer.'"  Def.'s Reply 12 (quoting New Jersey v. Anderson, 203 U.S. 483, 492 (1906) (footnote omitted)).  Payment of arbitrage rebate, defendant emphasizes, is "purely voluntary."  Def.'s Reply Pl.'s Supp'l Mem. 5 n.3.  But see Pl.'s 2d Supp'l Br. 5 ("[A]rbitrage rebate remittances are not 'voluntary' because they are mandated by business compulsion."); supra note 8; cf. Pl.'s 2d Supp'l Br. 5 ("[T]he fact that most State and local governments voluntarily submit arbitrage rebate remittances is also not sufficient to overcome the indicia of arbitrage rebate as a tax." (emphasis added)).

Plaintiff contends that arbitrage rebate satisfies this second component.  Id. ("There is little doubt that receipts from arbitrage rebate meet the second requirement in that the funds collected are used to support the Federal government.").  However, it asserts that "whether arbitrage rebate is an 'enforced contribution'[] is a more difficult question."  Id.

Nevertheless, plaintiff makes the argument that arbitrage rebate is both a "tax" and a "non-tax":

> [I]f the definition of 'tax' includes arbitrage rebate remittances that are collected and deposited in the U.S. Treasury by IRS agents employing enforcement measures that compel payment, then Plaintiff's arbitrage rebate remittance was a remittance of a 'tax' exacted pursuant to Title 26.  If, however, a tax is limited to only contributions that are treated by the IRS as a tax, then Plaintiff's remittance of arbitrage rebate was not a remittance of a tax.  Because no court has been asked to resolve this question after full briefing, Plaintiff briefs this Court on the impact of both answers to this primary.

Pl.'s Am. Opp'n 17 (footnote omitted); see also id. at 31 (arguing that plaintiff's remittance should be treated as a "deposit" regardless of the question of whether the remittance was of a "tax" or a "non-tax").  On the one hand, plaintiff asserts that remittance of arbitrage rebate is a "deposit of . . . tax," Pl.'s Am. Opp'n 18, because "[u]nder existing case law, arbitrage rebate is a tax," Pl.'s 2d Supp'l Br. 4; accord id. at 7 ("[M]any in the bond community today consider arbitrage rebate to be a tax (in essence, a 100% excise tax) imposed directly on State and local government bond issuers."); id. ("[R]ebate is a tax . . . ."); see also Pl.'s Am. Opp'n 18 (characterizing plaintiff's remittance of arbitrage rebate as "a deposit of such tax made for the purpose of avoiding significant penalties and interest and other serious[,] negative consequences").  Indeed, plaintiff claims that arbitrage rebate "is a disguised tax" and, consequently, plaintiff may be deemed "a taxpayer as it remitted a tax to the IRS."  Pl.'s Supp'l Mem. 10; see also Pl.'s 2d Supp'l Br. 7 (claiming that "changes in IRS enforcement and monitoring have eliminated any distinction between arbitrage rebate and other taxes").  But see Def.'s Reply Pl.'s Supp'l Mem. 5 n.3 (asserting that plaintiff's reliance upon IRS procedures for auditing issuers of tax-exempt bonds as support that arbitrage rebate constitutes a tax is erroneous given the voluntary nature of arbitrage rebate payment); supra note 25; infra note 26.  If arbitrage rebate is viewed as a tax, plaintiff asserts, then "there is no doubt that arbitrage rebate would fall within the definition of 'tax . . . penalty . . . sum' as defined by [26 U.S.C.] § 7422."  Pl.'s Am. Opp'n 18 (first & second alterations in original); see also id. (arguing that because plaintiff's remittance was "a deposit of such tax," section 7422 "is inapplicable to Plaintiff's remittance").

On the other hand, plaintiff also suggests that if defendant is correct and arbitrage rebate is a "non-tax" amount,[25] then plaintiff, as a non-taxpayer, can still bring a claim in the Court of Federal Claims because section 7422 does not apply. Id. at 24. It argues: "If, as Defendant asserts, arbitrage rebate is a non-tax amount, Defendant is correct that Plaintiff is not a 'taxpayer.' In this instance, the [IRC's] integrated <u>tax</u> refund scheme, which is applicable only to suits by taxpayers, does not apply." Pl.'s Supp'l Mem. 9. Section 7422, plaintiff asserts, does not apply to "non-tax" amounts: "[T]he purpose of [26 U.S.C.] § 7422–to protect tax revenue–is inconsistent with a finding that it applies to refund actions involving nontax remittances." Pl.'s Am. Opp'n 29; <u>see also id.</u> at 30 (citing cases purporting to support the proposition that section 7422 "applies to <u>taxpayers'</u> requests for the refund of <u>taxes</u> and . . . does <u>not</u> apply to actions taken by non-taxpayers").

While defendant notes that plaintiff's contradictory position is intentional,[26] it is plaintiff that accuses defendant of "flip-flopp[ing]" and "changing and dropping arguments throughout

---

[25]  Defendant notes that "Congress explicitly referred to the amount paid to the United States by issuers of tax-exempt bonds as a 'rebate,' not a 'tax.'" Def.'s Reply Pl.'s Supp'l Mem. 4. First, arbitrage rebate, defendant argues, is not a tax because, "[u]nlike a tax, arbitrage rebate cannot be collected by action against the will of the user." Def.'s Reply 12; <u>accord id.</u> at 12-13 (noting that payment of arbitrage rebate constitutes a "deliberate choice to earn arbitrage profits, at the expense of the Government, by investing in proceeds of its bonds in high-yield investments"); <u>see also</u> Def.'s Resp. Pl.'s 2d Supp'l Br. 3 (indicating that Revenue Procedure 2008-37 establishes a "separate deadline for filing an administrative refund claim for overpayments of arbitrage rebate," whereas the administrative refund claim filing deadlines set forth in 26 U.S.C. § 6511(a) apply only to taxes). Second, defendant explains that the distinction between "rebate" and "tax" "was undoubtedly intentional, when considered in light of the doctrine of 'intergovernmental tax immunity.'" Def.'s Reply Pl.'s Supp'l Mem. 4 (citing <u>South Carolina v. Baker</u>, 485 U.S. 505 (1988)); <u>accord id.</u> ("The general immunity of state or local governments from federal taxation 'arises from the constitutional structure and a concern for protecting state sovereignty whereas the federal immunity arises from the Supremacy Clause [of the United States Constitution].'" (quoting <u>Baker</u>, 485 U.S. at 519 n.11 (1988) (alteration in original))). <u>But see</u> Pl.'s 2d Supp'l Br. 6 (noting that the Supreme Court has previously invalidated tax laws found to be unconstitutional).

[26]  Defendant states:

While plaintiff's argument that its rebate payment was a "tax" seems internally inconsistent with its argument that it was nonetheless not required to file a refund claim under [26 U.S.C.] § 7422, its purpose is obviously to sidestep the refund claim requirement by asserting that its "tax" payment was really a tax "deposit," and hence excepted from the refund claim rules.

Def.'s Reply Pl.'s Supp'l Mem. 6.

this proceeding."  Pl.'s 2d Supplemental Reply Br. 3.  Yet, for its efforts to argue simultaneously that arbitrage rebate is and is not a "tax," plaintiff's underlying contention ultimately yields the same conclusion: section 7422(a), according to plaintiff, does not apply in this case.  See Pl.'s Am. Opp'n 31 ("Plaintiff's remittance should be treated as a deposit regardless of whether such remittance was a remittance of a tax or a remittance of a nontax amount subject to [26 U.S.C.] § 7422.").  It is therefore apparent that the court need not wade into what plaintiff itself suggests is uncharted territory by prescribing a "tax" or "non-tax" label to arbitrage rebate.  See Pl.'s Resp. Def.'s Supp'l Br. 2 ("Defendant avers that the Court can resolve this dispute over jurisdiction without defining the exact legal nature of arbitrage rebate.  Defendant is correct.  The particular remittance made by Plaintiff is a refundable deposit excepted from statutory exhaustion requirements regardless of whether rebate remittances are . . . taxes or nontax amounts.").  Instead, the court turns to the language of section 7422.

### B.  Applicability of Section 7422

It is a "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself."  Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); accord Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999); see also Diamond v. Chakrabarty, 447 U.S. 303, 315 (1980) ("[O]ur obligation is to take statutes as we find them, guided, if ambiguity appears, by the legislative history and statutory purpose.").  Terms are construed in accordance with their ordinary or natural meaning.  FDIC v. Meyer, 510 U.S. 471, 476 (1994); see also Perrin v. United States, 444 U.S. 37, 42 (1979) (stating that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" (citing Burns v. Alcala, 420 U.S. 575, 580-81 (1975)).  "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."  GTE Sylvania, Inc., 447 U.S. at 108.  The court, therefore, looks to the language of section 7422 in order to determine whether arbitrage rebate is contemplated therein.

### 1.  The IRC Implicitly Indicates That Section 7422 Is Broad in Scope

Defendant places importance upon the location of section 7422 within the IRC.  It states: "Implicit in [section] 7422, by virtue of its location . . . , is that its provisions are to apply to any sum that is alleged to have been excessive or in any manner wrongfully collected under the Internal Revenue Code."  Def.'s Mot. 15.  In essence, defendant asserts that "[s]ince Congress did not provide specific means for the recovery or arbitrage rebate, its decision to place the rebate provisions within the [IRC] is a clear indication that Congress intended the provisions of [section] 7422–already in place–to apply to any suit for recovery."  Id.; accord id. at 14-15 (stating that when Congress enacted provisions for mortgage subsidy bonds, industrial development bonds, and ultimately all types of bonds to rectify arbitrage violations, it "provided no simultaneous statutory mechanism for the recovery of an alleged overpayment of arbitrage rebate," and instead relied upon section 7422).

Plaintiff questions this assertion, arguing that "Congress has prescribed separate provisions within Title 26 that differentiate between the legal rights of taxpayers and non-taxpayers." Pl.'s Am. Opp'n 25. It emphasizes that neither 26 U.S.C. § 6532(c)[27] nor 26 U.S.C. § 7426[28] applies to taxpayers, whereas 26 U.S.C. § 6532(a) does.[29] See id. Since section 7426(f) explicitly provides that "[t]he provisions of section 7422(a) (relating to prohibition of suit prior to filing claim for refund) shall not apply to actions under this section," 26 U.S.C. § 7426(f), plaintiff maintains that section 7422 "does not apply to suits by non-taxpayers," Pl.'s Am. Opp'n 25.

Plaintiff's counter argument, however, attempts to lead the court down a path that need not be traveled.[30] Without passing on the "tax" versus "non-tax" argument, the IRC does, in fact, implicitly suggest that section 7422 is applied broadly absent an explicit statutory exception. For example, section 6532(a)(1), which imposes a limitations period on suits by taxpayers for the refund of any "internal revenue tax, penalty, or other sum," specifically references section 7422. 26 U.S.C. § 6532(a)(1). Section 6532(c)(1), however, does not reference section 7422 because it applies only to suits or proceedings under section 7426, see id. § 6532(c)(1), and section 7426

---

[27] Section 6532(c)(1) provides for suits by persons other than taxpayers: "Except as provided by paragraph (2), no suit or proceeding under section 7426 shall be begun after the expiration of 9 months from the date of the levy or agreement giving rise to such action." 26 U.S.C. § 6532(c)(1). Section 6532(c)(2), which governs a request for the return of property described in section 6343(b), is not implicated in this action. See id. § 6532(c)(2).

[28] Section 7426 governs civil actions by persons other than taxpayers. See 26 U.S.C. § 7426. The actions permitted under this section include: wrongful levy; surplus proceeds; substituted sales proceeds; and substitution of value. See id. § 7426(a)(1)-(4).

[29] Section 6532(a)(1) provides:

No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates.

26 U.S.C. § 6532(a)(1).

[30] Indeed, section 7422, entitled "Civil actions for refund," is located within Subchapter B, "Proceedings by Taxpayers and Third Parties," of Chapter 76, "Judicial Proceedings," in the IRC.

suits are specifically excepted from the administrative claim requirements of section 7422,[31] see id. § 7426(f).  These provisions suggest that where Congress does not intend for section 7422 to apply to certain actions allowed in the IRC, it has provided the appropriate exclusion.[32]  Nevertheless, while the court finds support for defendant's argument in the IRC, it does not find this argument dispositive.[33]

### 2.  The Supreme Court Has Determined That Section 7422(a) Is Broad in Scope

As stated above, unless a claim for refund was "duly filed" with the IRS, section 7422(a) prohibits a suit or proceeding in "any court" for the recovery of (1) "any internal revenue tax alleged to have been erroneously or illegally assessed or collected," (2) "any penalty claimed to have been collected without authority," or (3) "any sum" alleged to have been wrongfully collected "in any manner."  Id. § 7422(a) (emphasis added).  The term "any," which is defined as "[o]ne, some, every, or all without specification," American Heritage College Dictionary 64 (4th ed. 2004), suggests that Congress did not seek to qualify the terms "internal revenue tax," "penalty," "sum," or the "manner" in which a sum has been collected.  See 26 U.S.C. § 7422(a).  In fact, the Supreme Court determined that Congress intended a broad scope for section 7422(a) when it analyzed the provision in Clintwood Elkhorn Mining Co.  There, the Supreme Court concluded that with "[f]ive 'any's' in one sentence[,] . . . it begins to seem that Congress meant

_____

[31]  While plaintiff emphasizes the "tax" versus "non-tax" applicability of section 6532(a)(1) and section 6532(c)(1), respectively, the court notes that if section 7422 applies only to taxpayers, as plaintiff asserts, then Congress would not have needed to specify in section 7426(f) that section 7422 did not, in fact, apply to the four non-taxpayer suits described therein.  That Congress provided for this exception lends support to defendant's contention that section 7422 is overarching and that it applies to suits initiated by both taxpayers and non-taxpayers unless an explicit exception within the IRC provides otherwise.

[32]  Similarly, defendant notes that "Congress has explicitly exempted other amounts collected under the [IRC] from the [IRC's] administrative provisions where it did not intend for them to apply."  Def.'s Mot. 15.

[33]  Plaintiff, in fact, suggests, as noted in footnote 18, supra, that section 6532(a)(1) applies to this action:

> Notwithstanding . . . Plaintiff's filing of a claim several months ago to start the 6-month period under IRC [section] 6532[(a)(1)], which applies a six-month waiting period for claims filed pursuant to IRC [section] 7422, Plaintiff has not asked to withdraw this action and, therefore, avoid costs related to the briefing of this issue, as there is no guarantee that the Defendant will not, once again, change its position upon such a re-filing.

Pl.'s Am. Opp'n 33 n.38.

the statute to have expansive reach." 128 S. Ct. at 1516; <u>see also</u> Supplemental Br. United States Supp. Mot. Dismiss Compl. Lack of Subject-Matter Jurisdiction ("Def.'s Supp'l Br.") 3 (stating that <u>Clintwood Elkhorn Mining Co.</u> "makes abundantly clear that Congress intended [section] 7422(a) to have very broad application"). Ultimately, the court is bound by the Supreme Court's interpretation of section 7422(a).[34] <u>See</u> <u>Coltec Indus., Inc. v. United States</u>, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims."). Therefore, Congress intended that section 7422(a) preclude suits or proceedings for the recovery of a broad range of claims.

Plaintiff nevertheless contends that the plain language of section 7422(a) is "of little assistance as the wording of [section] 7422 is broad enough to apply to any debt in dispute . . . ." Pl.'s Am. Opp'n 24 (citing <u>In re Air Transp. Excise Tax Litig.</u>, 37 F. Supp. 2d 1133, 1135 (D. Minn. 1999)).[35] The court disagrees. The Supreme Court's determination that section 7422(a) is expansive does not suggest that the scope of this provision is endless. Rather, as the language of section 7422(a) makes clear, the statutory bar to initiating suits or proceedings is implicated only with respect to actions seeking the recovery of the following: any erroneously assessed or collected tax, any penalty collected without authority, or any sum wrongfully collected in any manner. <u>See</u> 26 U.S.C. § 7422(a). The question is whether arbitrage rebate is encompassed within one of these discrete, albeit broad, categories.

### 3. The Broad Scope of the "Any Sum" Clause Contained in Section 7422(a) Encompasses Arbitrage Rebate

Defendant's primary argument is that arbitrage rebate is encompassed by the clause contained in section 7422 that refers to "a[ny] 'sum alleged to have been excessive or in any manner wrongfully collected.'" Def.'s Mot. 8 (quoting 26 U.S.C. § 7422(a)); <u>see also</u> Def.'s Reply Pl.'s Supp'l Mem. 2 (arguing that the "any sum" language contained in section 7422(a) should be given the same effect as similar language contained in other IRC provisions, as well as in 28 U.S.C. § 1346(a)). Specifically, defendant argues that "issuers [must] file an administrative claim with the IRS prior to initiating suit to recover arbitrage rebate" because "arbitrage rebate is described in the all-inclusive phrase, 'any sum alleged to have been excessive or in any manner wrongfully collected.'"[36] Def.'s Mot. 9-10 (quoting 26 U.S.C. § 7422(a)). Based upon this

---

[34] Plaintiff suggests that <u>Clintwood Elkhorn Mining Co.</u> "is not 'on all fours' with this proceeding." Pl.'s Supp'l Mem. 5. The court further addresses <u>Clintwood Elkhorn Mining Co.</u> in Part III.B.5, <u>infra</u>.

[35] The court addresses plaintiff's reliance upon <u>In re Air Transporation Excise Tax Litigation</u> in Part III.B.3.b, <u>infra</u>.

[36] Defendant's position suggests that arbitrage is not a "tax," but is instead a "non-tax" item that is nonetheless encompassed by the "any sum" language of section 7422(a). <u>See</u> Def.'s

language, defendant notes that its interpretation of "any sum" comports with those words' "ordinary, contemporary meaning." Id. at 9 (citing Perrin, 444 U.S. at 42). Plaintiff asserts that a broad interpretation of the term "sum" is erroneous, Pl.'s Am. Opp'n 24 (citing In re Air Transportation Excise Tax Litigation), and that there are "no provisions within Title 26 that would define arbitrage rebate as a tax," id. at 10.

### a. Previous Interpretations of Section 7422(a) Support the Conclusion That Arbitrage Rebate Falls Within the Phrase "Any Sum"

In 1872, Congress introduced the phrase "any sum" into the predecessor statute to 26 U.S.C. § 7422(a), see Flora II, 362 U.S. at 155 n.16, which provided:

> That all suits and proceedings for the recovery of any internal tax alleged to have been erroneously assessed or collected, or any penalty claimed to have been collected without authority, or for any sum which it is alleged was excessive, or in any manner wrongfully collected, shall be brought within two years next after the cause of action accrued and not after; and all claims for the refunding of any internal tax or penalty shall be presented to the commissioner of internal revenue within two years next after the cause of action accrued and not after . . . .

Act of June 6, 1872, § 44, 17 Stat. 230, 257-58 (emphasis added). Five years later, the Supreme Court, interpreting a different statute that contained the term "sum," acknowledged that "[o]ne of the lexical definitions of the word 'sum,' and the sense in which it is most commonly used, is 'money.'" United States v. Van Auken, 96 U.S. 366, 368 (1877). This definition included "'[a] quantity of money or currency; an amount indefinitely, as a sum of money, a small sum, or a large sum.'" Id. (quoting Webster's Dictionary). The definition of "sum" has not changed since the mid-nineteenth century. See, e.g., American Heritage College Dictionary, supra, at 1381 (defining "sum" as "[a]n amount of money"); Black's Law Dictionary 1449 (7th ed. 1999) (defining "sum" as a "quantity of money"). Defendant therefore asserts that the contemporary definition of the term "any sum" contained in the predecessor statute of section 7422 remains viable today, thereby supporting the contention that section 7422(a) contemplates "the recovery of 'any money [other than tax or penalty] alleged to have been excessive or in any manner wrongfully collected.'" Def.'s Mot. 10 (quoting 26 U.S.C. § 7422(a)) (alteration in original).

Defendant finds support for its contention that the 1870s definition of "sum" "has endured over the years to the present," id., in Flora II, which was decided by the Supreme Court

---

Mot. 9-13 (discussing the history of revenue statutes and emphasizing the broad scope of the phrase "any sum"). As discussed above, the court need not decide whether arbitrage rebate is a "tax" for the purpose of resolving the instant motion.

approximately fifty years ago,[37] id. at 12.  The Flora II court, in construing 28 U.S.C.
§ 1346(a)(1), determined that the phrase "any sum" did not, contrary to the petitioner's argument,
confer jurisdiction to adjudicate suits for refund of only part of a tax, 362 U.S. at 149.  Instead,
the Supreme Court explained:

> The sweeping role which petitioner assigns these words is based upon a
> conjunctive reading of "any internal-revenue tax," "any penalty," and "any sum."
> But we believe that the statute more readily lends itself to the disjunctive reading
> which is suggested by the connective "or."  That is, "any sum," instead of being
> related to "any internal-revenue tax" and "any penalty," may refer to amounts
> which are neither taxes nor penalties.  Under this interpretation, the function of
> the phrase is to permit suit for recovery of items which might not be designated as
> either "taxes" or "penalties" by Congress or the courts.  One obvious example of
> such a "sum" is interest.  And it is significant that many old tax statutes described
> the amount which was to be assessed under certain circumstances as a "sum" to be
> added to the tax, simply as a "sum," as a "percentum," or as "costs."[38]

Id. (footnote & emphasis added).  Thus, the Supreme Court concluded that Congress intended "to
cover taxes, penalties, and sums which might, strictly speaking, be neither taxes nor penalties."
Id. at 155 n.16.  Subsequent cases have also concluded that the term "sum" is broadly construed.

---

[37] In Flora I, which was affirmed by Flora II, the Supreme Court limited the court's tax
refund suit jurisdiction to include only those claims in which the taxpayer fully paid all taxes
assessed for the tax year at issue prior to the initiation of the claim.  357 U.S. at 72-73.  The
Flora I court's interpretation of the legislative history of 28 U.S.C. § 1346(a)(1) yielded a
conclusion that Congress intended no change to the requirement that full payment must be made
before instituting suit.  357 U.S. at 72-73; accord Flora II, 362 U.S. at 155 (determining that the
language set forth in 28 U.S.C. § 1346(a)(1) "reflects an understanding that full payment of the
tax was a prerequisite to suit").

[38] The Flora II court, by concluding that full payment was required before a party could
file a refund claim and affirming Flora I, relied upon the phrase "any sum" to reject an argument
supporting partial payment:

> A careful reading of this statute discloses the absurd result which would flow
> from construing the addition of the "any sum" language to affect the full-payment
> rule, which, under this argument would be based upon the "any tax" phrase in the
> 1866 statute.  That is, since the "any sum" phrase occurs only in the statute of
> limitations portion of the 1872 statute, and not in the claim-for-refund provision, a
> person would be able to bring a suit for part payment without filing a claim for
> refund.

Flora II, 362 U.S. at 155 n.16.

See, e.g., Brennan v. Sw. Airlines Co., 134 F.3d 1405, 1410 (9th Cir. 1998) ("Section 7422 contrasts the narrow concept of an 'internal revenue tax' with the broad concept of 'any sum.'"); Hampton v. United States, 513 F.2d 1234, 1243 (Ct. Cl. 1975) (characterizing the phrase "any sum" in section 7422(a) as "all inclusive"); J.O. Johnson, Inc. v. United States, 476 F.2d 1337, 1341 (Ct. Cl. 1973) (determining that the "all-inclusive 'any sum' term" included the assessment for accumulated earnings tax); Alexander Proudfoot Co., 454 F.2d at 1380 (acknowledging that section 7422(a) "forbids, in all-inclusive words, any suit" that falls within its terms (emphasis added)); see also United States v. Williams, 514 U.S. 527, 532 (1995) (noting that 28 U.S.C. § 1346(a)(1), which also includes the phrase "any sum," contains "broad language").

**b.   The Concerns Expressed by the District Court in In re Air Transportation Excise Tax Litigation Over a Broad Reading of Section 7422 Are Not Implicated Here**

Plaintiff, citing the decision in In re Air Transportation Excise Tax Litigation, cautions that the court should not embrace a reading of the plain language of section 7422 that is too broad, but its reliance upon the case is misplaced.  In that case, the plaintiffs, who purported to represent a class of Federal Express Corporation ("FedEx") customers that shipped packages through FedEx during an eight-month period in 1996 and a two-month period in 1997,[39] alleged that FedEx "represented in its contract documents that its rates included [an] excise tax on the transportation of property by air when, in fact, the excise tax was not in effect.  37 F. Supp. 2d at 1135.  According to these plaintiffs, FedEx "wrongfully enjoyed a windfall by continuing to collect from Plaintiffs an amount equal to the expired tax."  Id.  FedEx argued, inter alia, that (1) the plaintiffs asserted a tax refund claim, (2) the claim was barred by 26 U.S.C. § 7422 because the plaintiffs never filed a refund claim with the IRS, and (3) FedEx was not a proper defendant to a tax refund suit.  Id.

Although the district court granted FedEx's Rule 12(c) motion, which it treated as one for summary judgment pursuant to Rule 56, see id. at 1134, it rejected FedEx's contention that section 7422 barred the plaintiffs' suit, holding that "Plaintiffs' claims are not preempted by [IRC] section 7422," id. at 1138.  It noted that "it would be futile for Plaintiffs here to seek a refund from the IRS," id. at 1137, for two reasons: (1) FedEx never paid anything to the IRS, id. at 1136; accord id. at 1137 ("[T]he IRS never received any money from FedEx that it could refund to them . . . ."); and (2) plaintiffs "have no way of knowing how much of their shipping charges constituted an amount equal to the expired tax," id. at 1136; accord id. at 1137 (stating that "neither the Plaintiffs nor the IRS have any idea what the amount of refund should be (if any)").  Accordingly, the district court limited the application of section 7422 to instances in which a taxpayer subject to an internal revenue tax "seeks to recover a purported and paid 'tax' that was actually 'assessed' or 'collected' on behalf of the government and that was actually paid to the government."  Id. at 1137.  Payment to the government, therefore, was a necessary element of section 7422.

---

[39]  The court noted that these plaintiffs had not moved for class certification.  See 37 F. Supp. 2d at 1135 n.2.

The district court derived this conclusion from the term "recover" contained in section 7422, which "carries the implicit assumption that the funds are, in fact, 'recoverable'–that is, that the funds are either <u>already in government coffers</u> or, at least, are <u>within the government's easy reach</u>." <u>Id.</u> (emphasis added).  As such, the district court rejected FedEx's contention that the term "any sum" was broad enough to encompass the plaintiffs' action regardless of whether there existed any internal revenue tax for the plaintiffs to recover.  <u>Id.</u> at 1138.  In the circumstances presented before it, section 7422, the district court reasoned, "does not preclude actions where . . . a person who was not subject to an internal revenue tax seeks to recover an amount alleged to have been collected by someone else . . . ."  <u>Id.</u>  In other words, "[t]he [c]ourt simply declines to read section 7422 as requiring a person to go to the IRS to recover an incalculable 'tax' that was never due, assessed[,] or paid."  <u>Id.</u>

Furthermore, the district court declined to adopt FedEx's proffered broad interpretation of the term "sum" because the result would compel a party to involve the IRS when the government, in fact, had no connection to the amount at issue.  It explained that FedEx's reading of section 7422

> would require <u>anyone who pays an allegedly excessive or wrongful "sum" to anyone else, for any reason, to first seek to recover that sum from the IRS, and then the United States</u>–even though the government would have no knowledge of, interest in, or nexus to the sum alleged to have been excessive or wrongful.

<u>Id.</u> (emphasis added).  Requiring that a party first seek recovery from the IRS in the instance where the government had no involvement or knowledge would, the district court concluded, "produce an absurd and unjust result which Congress could not have intended.'"  <u>Id.</u> (quoting <u>Clinton v. City of New York</u>, 524 U.S. 417, 429 (1998)).

The concerns expressed by the district court in <u>In re Air Transportation Excise Tax Litigation</u> are not implicated here.  In this case, plaintiff paid arbitrage rebate directly to the government rather than to a third-party entity.  The amount of arbitrage rebate was readily calculable and was due, as stated in the June 26, 2006 jeopardy notice.  Plaintiff seeks a refund from the government, not from a third party.  The district court's refusal to entertain broad interpretations of section 7422 was limited to the circumstances presented before it, which are wholly distinguishable from those implicated in this case.  No pronouncement in <u>In re Air Transportation Excise Tax Litigation</u> supports plaintiff's contention that "sum" should not be read broadly to encompass arbitrage rebate, and the court is not bound by the district court's determination.[40]  <u>See Stelco Holding Co. v. United States</u>, 44 Fed. Cl. 703, 709 n.11 (1999)

---

[40] While it addressed monies collected based upon a federal excise tax, the district court's determination that section 7422 "is limited in its application to instances in which a <u>taxpayer</u> . . . seeks to recover a purported and paid 'tax,'" 37 F. Supp. 2d at 1137, does not suggest that section 7422 is limited only to "taxpayer[s]."

-29-

(considering "precedents decided by the other federal courts of appeal and the federal district courts as instructive, though not binding").

### 4.  The Court Declines to Embrace the Analysis Contained in Pennoni I

Plaintiff next contends that section 7422 "does not begin and end with the words 'tax' and 'sum.'" Pl.'s Am. Opp'n 32.  It asserts that section 7422(a) "provides that no suit for a tax refund can be filed 'until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.'" Id. (quoting 26 U.S.C. § 7422(a)).  Plaintiff suggests that "where a claim process is not provided for in the statute, [section 7422(a)] imposes some minor obligations on government officials to provide a pre-application regulatory path for claim filing." Id.

Plaintiff relies upon Pennoni I, wherein the plaintiff alleged that the IRS sent an erroneous refund check and later garnished his wages–and levied his bank account–in order to satisfy a tax deficiency.  79 Fed. Cl. at 552-54.  The plaintiff claimed that he was entitled to recover the amounts garnished and levied because the IRS failed to follow proper procedures under the IRC for recouping an erroneous refund.  Id. at 555.  The government moved to dismiss pursuant to RCFC 12(b)(1) because the plaintiff's action was, defendant asserted,

> properly characterized as a civil action for refund under 26 U.S.C. § 7422 and . . . plaintiff's case is barred because he failed to satisfy the criteria for such a refund suit, including the requirement in 26 U.S.C. §§ 7422 and 6511 that he first file a timely and sufficient administrative refund claim . . . .

Id.  The court denied the government's motion, id. at 553, 562, holding that while the phrases "any sum" and "other sum" contained in sections 7422(a) and 6532(a), respectively, "might appear broad enough to encompass" plaintiff's illegal exaction claim, those statutes were, in fact, limited to tax refund suits "for the recovery of 'overpayment of any tax,'" id. at 557.

The Pennoni I court, which reached this determination by relying upon New York Life Insurance Co. v. United States, 118 F.3d 1553 (Fed. Cir. 1997),[41] and Usibelli Coal Mine, 54 Fed. Cl. 373 (2002), rev'd & remanded by Nos. 2006-5068, 2006-5075, 2008 U.S. App. LEXIS

---

[41]  The Federal Circuit determined that the monies at issue in New York Life Insurance Co. were deposits, rather than payment of taxes.  N.Y. Life Ins. Co., 118 F.3d at 1569-60.  Relying upon authority that determined that a payment expected to accrue in the future did not constitute a payment of taxes erroneously or illegally assessed or collected such that a plaintiff could file a claim for refund, the Federal Circuit concluded that section 7422(a) did not apply because the underlying action was, in fact, not a suit for the return of a tax payment.  Id. at 1558.  Plaintiff therefore argues that its remittance "should be treated as a deposit" of tax.  See Pl.'s Am. Opp'n 31; Pl.'s 2d Supp'l Br. 1 (citing N.Y. Life Insurance Co.).

15735 (Fed. Cir. June 25, 2008) (unpublished order),[42] focused upon the language of sections 7422(a), 6511(a), and 6532(a), and indicated that the broad terms "any sum" and "other sum" were limited by section 6511(a) to suits for the recovery of "tax payments" and of "overpayment of any tax." 79 Fed. Cl. at 556-57.  Defendant, however, asserts that this conclusion was reached "without the benefit of briefing by the parties on the applicability of the 'any sum' language of [section] 7422(a) to the plaintiff's suit, although the issue was discussed at oral argument . . . ." Def.'s Reply 6.  According to defendant, the Pennoni I court's determination gave "no effect to the 'sum' language contained in [section] 7422(a) and [section] 6532(a)," id., and was, in light of the Supreme Court's subsequent decision in Clintwood Elkhorn Mining Co., decided incorrectly, Def.'s Supp'l Br. 6.

––––––––––––––––

[42]   The Federal Circuit reversed the decision of the Court of Federal Claims, concluding that Usibelli Coal Mine could not bring a complaint under the Tucker Act in light of the Supreme Court's decision in Clintwood Elkhorn Mining Co.  See 2008 U.S. App. LEXIS 15735, at *3.  In an unpublished order, it noted that "[t]he taxpayer in this case is in the same position as the taxpayers in Clintwood Elkhorn [Mining Co.]," id. at *2, and stated that although "the taxpayer had failed to file timely administrative refund claims in compliance with the IRS, the Court of Federal Claims held that it had jurisdiction over the complaint under the Tucker Act," id. at *2-3.  Since that determination was "incorrect under Clintwood Elkhorn [Mining Co.]," the judgment of the trial court "must be reversed.  Id. at *3.  Thus, Usibelli Coal Mine was completely reversed on the merits, making any reliance upon it inconsequential.

Even if Usibelli Coal Mine had not been reversed, it is not relevant to the instant dispute. In that case, the court discussed the language and legislative history of 28 U.S.C. § 2411, the predecessor statute of which, between 1921 and 1928, "incorporated precisely the same language now found" in 26 U.S.C. § 7422.  54 Fed. Cl. at 383 (quoting the predecessor statute, which included the phrase "for any internal-revenue tax erroneously or illegally assessed or collected, or for any penalty collected without authority or for any sum which was excessive or in any manner wrongfully collected, under the internal-revenue laws").  The court noted that in 1928, this statutory language was deleted and replaced by the phrase "for any overpayment in respect of any internal-revenue tax," id. (citing the Revenue Act of 1928, 45 Stat. 791, 876-77), although the legislative history "attribute[d] no significance whatsoever to this shift in language," id.  The court explained that with the enactment of title 28 of the United States Code into positive law in 1948, the predecessor to section 2411 "once again incorporated essentially the same language as current section 7422(a)," a change that the Congress apparently deemed neither significant nor substantive.  Id.  Since the "oscillation from one version of this language to another[] suggest[ed] no substantive change, but merely a repeated shift in phraseology," id. at 384, the court concluded that "sum" and "overpayment" were "either synonymous or, at least, not significantly different," id. at 385; see also id. (noting that the court "simply cannot attach talismanic significance to the fact that the Congress at one point or another used the word 'overpayment' versus the language currently found in section 7422(a)").  Ultimately, the Usibelli court never addressed the import of the term "any sum" contained in section 7422(a).

-31-

The Pennoni I court also found support for its determination that jurisdiction attached within Technical Advice Memorandum 2004-46-021,[43] see 79 Fed. Cl. at 557, which plaintiff asserts "explains why arbitrage rebate refund requests, when treated as refund requests for nontax remittances, are not subject to . . . [section] 7422 requirements," Pl.'s Am. Opp'n 30.  Technical Advice Memorandum 2004-46-021 considered whether the period of limitations for an issuer of bonds to bring suit to recover an overpayment of arbitrage rebate paid to the IRS was two years–pursuant to 26 U.S.C. § 6532(a)–or six years–pursuant to 28 U.S.C. §§ 2401, 2501.  See I.R.S. Tech. Adv. Mem. 2004-46-021 (Nov. 12, 2004).  Because both the IRS and the issuer "agree[d] that an arbitrage rebate [was] not an internal revenue tax or penalty for purposes of [26 U.S.C.] §§ 7422 and 6532, or 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1)," the requirement to file a claim and the timing of the filing of the claim under sections 6402 and 6511 of the IRC, respectively, were "not applicable."  Id.  The issuer, however, asserted that an arbitrage rebate was "'any sum' under those sections . . . ."  Id.

Noting that the Supreme Court's discussion of the "catchall phrase" of "any sum" in Flora II was "instructive" and analyzing the legislative history of the relevant statutory language, the IRS concluded that "the 'any sum' phrase related to costs incidental to the recovery of an internal revenue tax."  I.R.S. Tech. Adv. Mem. 2004-46-021.  The IRS concluded that arbitrage rebate fell outside this realm:

> An arbitrage rebate under [26 U.S.C.] § 148 is not incidental to the recovery of an internal revenue tax; the payment of a rebate is an alternative to a payment of tax and stands apart from any tax.  The rebate cannot be collected from an issuer using the tax collection procedures provided by the [IRC].  Moreover, we have found nothing in the ancestry of the "any sum" language to indicate that the phrase applies to nontax claims.  Thus, "any sum" does not encompass an arbitrage rebate.

Id.; see also id. (concluding that a "deposit, although not a payment of tax, is not 'any sum' sufficient to come within the purview of [26 U.S.C.] § 7422" (citing N.Y. Life Ins. Co., 118 F.3d at 1558)).  This determination, the IRS indicated, was "consistent with the [IRS's] long-standing position regarding claims for refund of overpayment interest . . . ."  Id.

Both Pennoni I and Technical Advice Memorandum 2004-46-021 were issued before the Supreme Court decided Clintwood Elkhorn Mining Co.  On December 14, 2007, nearly eight months after the Supreme Court's ruling, the IRS issued Technical Advice Memorandum 2007-50-018, which revoked Technical Advice Memorandum 2004-46-021: "Technical Advice

---

[43]  Technical advice memoranda are not binding on the Court of Federal Claims.  See 26 U.S.C. § 6110(k)(3) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent."); id. § 6110(b)(1)(A) (defining the term "written determination" to include a "ruling, determination letter, technical advice memorandum, or Chief Counsel advice"); Kerr-McGee Corp. v. United States, 77 Fed. Cl. 309, 315 (2007).

Memorandum 200446021 . . . has been reconsidered and is now revoked.  We have now concluded that the arbitrage rebate overpayment described in [Technical Advice Memorandum] 200446021 is within the meaning of the 'any sum' language contained in [IRC] § 7422(a)."  I.R.S. Tech. Adv. Mem. 2007-50-018 (Dec. 14, 2007).  In light of <u>Clintwood Elkhorn Mining Co.</u>, the parties in <u>Pennoni I</u> re-briefed the jurisdictional issue in their cross-motions for summary judgment.  Since <u>Pennoni I</u>, which was decided before <u>Clintwood Elkhorn Mining Co.</u>, buttressed its analysis, in part, based upon <u>Usibelli Coal Mine</u>, which was later reversed, and a technical advice memorandum that has since been revoked, the court declines plaintiff's invitation to adopt the <u>Pennoni I</u> court's analysis in order to hold that jurisdiction is properly asserted in this case.[44]

Furthermore, subsequent to the close of briefing in the case <u>sub judice</u>, the Honorable Nancy B. Firestone, on February 26, 2009, issued another decision in <u>Pennoni v. United States</u>, wherein the court considered the effect of <u>Clintwood Elkhorn Mining Co.</u> on the plaintiff's claim.  <u>See</u> <u>Pennoni v. United States</u> ("<u>Pennoni II</u>"), No. 06-861T, 2009 WL 522905 (Fed. Cl. Feb. 27, 2009).  The <u>Pennoni II</u> court determined that it lacked subject matter jurisdiction to consider the plaintiff's claim because the plaintiff had not satisfied the refund requirements set forth in 26 U.S.C. § 7422(a).  <u>Id.</u> at *6-9, *13.  In light of <u>Pennoni II</u>, the decision in <u>Pennoni I</u> offers plaintiff no support.

### 5.  The Supreme Court's Decision in <u>Clintwood Elkhorn Mining Co.</u> Indicates That "Any Sum" Contemplates "Tax" as Well as "Non-Tax" Amounts

Plaintiff contends that the Supreme Court's decision in <u>Clintwood Elkhorn Mining Co.</u> is inapposite because its holding "neither addresses the deposit exception to the claim-filing requirement nor its applicability to remittances of arbitrage rebate."  Pl.'s Supp'l Mem. 5.  It notes that Chief Justice John G. Roberts, Jr., writing for a unanimous court, "lends a hand to our legal wrangling . . . by referring to a 'scheme' for tax refunds <u>sixteen</u> times in his twelve-page opinion."  <u>Id.</u>  As such, plaintiff asserts that <u>Clintwood Elkhorn Mining Co.</u>, having characterized the IRC as a "tax refund scheme,"[45] <u>id.</u>, supports its contention that this scheme "applies broadly to virtually all remittances of taxes, penalties[,] and 'other sums,' so long as such amounts are <u>remitted by persons who either 'paid' or were 'subject to' a tax</u>," <u>id.</u> at 8.  In other words, plaintiff concludes, the IRC's refund scheme does not contemplate arbitrage rebate refund suits because that scheme applies only to taxpayers, a class to which plaintiff does not belong.  <u>Id.</u> at 9; <u>accord</u> <u>id.</u> (reiterating defendant's position that plaintiff is not a taxpayer); <u>see also</u> <u>id.</u> at 10

---

[44]  Other Court of Federal Claims decisions do not set binding precedent for separate and distinct cases pending before the court.  <u>W. Coast Gen. Corp. v. Dalton</u>, 39 F.3d 312, 315 (Fed. Cir. 1994).

[45]  Plaintiff states: "[T]he Supreme Court unanimously believes that Congress enacted a tax refund scheme within the [IRC]."  Pl.'s Supp'l Mem. 5.

(noting that the term "taxpayer," as defined by the IRC, "mean[s] someone 'subject to a tax'"[46] (quoting 26 U.S.C. § 7701(a)(14))); Pl.'s 2d Supp'l Br. 13 (arguing that the "tax refund scheme" discussed in Clintwood Elkhorn Mining Co. "applies to amounts[] such as taxes, interest[,] and tax penalties[] paid by taxpayers"). Defendant argues that plaintiff is misreading the import of the Supreme Court's holding in order to carve out an interpretation that is inconsistent with prior precedent. See Def.'s Reply Pl.'s Supp'l Mem. 2 & n.2.

That Clintwood Elkhorn Mining Co. addressed the IRC with respect to a tax refund is undisputed, as evidenced by the manner in which the Supreme Court framed the question presented before it: "whether a taxpayer suing for a refund of taxes collected in violation of the Export Clause of the Constitution may proceed under the Tucker Act, when his suit does not meet the time limits for refund actions in the [IRC]." 128 S. Ct. at 1514 (emphasis added). The taxpayers in that case, three coal companies, had, since 1978, paid taxes on coal exports pursuant to 26 U.S.C. §§ 4121(a)(1), 4221(a). Id. at 1515. After section 4212(a) was held unconstitutional as applied to coal exports,[47] the coal companies filed administrative claims with the IRS for their 1997, 1998, and 1999 payments "in accordance with the refund scheme" provided by the IRC. Id. The companies eventually received from the IRS a refund of those taxes, with interest. Id. The companies, however, did not file administrative claims with the IRS for the taxes they paid in 1994, 1995, and 1996, instead initiating suit in the Court of Federal Claims. Id. "Notwithstanding the failure of the companies to file timely administrative refund claims" as required by 26 U.S.C. § 6511, the Court of Federal Claims permitted the companies to pursue their claim under the Export Clause of the Constitution based upon the Tucker Act's conferral of jurisdiction and six-year statute of limitations.[48] Id. Finding that the coal companies could pursue their claims under the Export Clause even though they did not timely file administrative refund claims with the IRS, the Federal Circuit affirmed that the Court of Federal Claims possessed jurisdiction, but reversed the trial court's holding related to interest, finding that the government was required to pay interest to the companies pursuant to 28 U.S.C. § 2411. Id. at 1516. The Supreme Court reversed the Federal Circuit's jurisdictional ruling. Id.

---

[46] For the purpose of accuracy, section 7701(a)(14) defines a taxpayer as "any person subject to any internal revenue tax." 26 U.S.C. § 7701(a)(14).

[47] As the trial court noted, the government did not appeal the holding of the United States District Court for the Eastern District of Virginia that the coal tax was unconstitutional as applied to exports, and the IRS subsequently issued a notice of acquiescence of that holding. Andalex Res., Inc. v. United States, 54 Fed. Cl. 563, 564 (2002) (citing Ranger Fuel Corp. v. United States, 33 F. Supp. 2d 466 (E.D. Va. 1998)), aff'd in part, rev'd in part sub nom. Clintwood Elkhorn Mining Co. v. United States, 473 F.3d 1373 (Fed. Cir. 2007), rev'd, 128 S. Ct. at 1511.

[48] The Export Clause provides: "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const. art. I, § 9, cl. 5.

As discussed in Part III.B.1, supra, the Supreme Court interpreted the statutory language of 26 U.S.C. § 7422(a) broadly. See 128 S. Ct. at 1516. Reading section 7422(a) in conjunction with 26 U.S.C. § 6511, the Supreme Court indicated that the latter provision imposed time limitations for filing administrative refund claims with respect "to any tax imposed by [title 26 of the United States Code]" in "an 'unusually emphatic form.'" Id. (quoting United States v. Brockamp, 519 U.S. 347, 350 (1997)). Since the coal companies were seeking a refund of taxes imposed by title 26, the Supreme Court determined that the statutory language of section 6511 "plainly covers the companies' claim . . . ." Id.; accord id. ("[W]e cannot imagine what language could more clearly state that taxpayers seeking refunds of unlawfully assessed taxes must comply with the [IRC's] refund scheme before bringing suit, including the requirement to file a timely administrative claim."). This holding, namely that sections 7422(a) and 6511 "require[] a taxpayer seeking a refund for a tax assessed in violation of the Export Clause, just as for any other unlawfully assessed tax, to file a timely administrative refund claim before bringing suit against the Government," id. at 1520, comported with Supreme Court's previous ruling in United States v. A.S. Kreider Co., 313 U.S. 443 (1941), wherein it construed section 1113(a) of the Revenue Act of 1926 as precluding a tax refund action filed outside the time limits set forth therein, regardless of the statutory bar prescribed under the Tucker Act. See Clintwood Elkhorn Mining Co., 128 S. Ct. at 1516-17. Congress, the Supreme Court explained, "left it open to provide less liberally for particular actions which, because of special considerations, required different treatment." A.S. Kreider Co., 313 U.S. at 447. Thus, if courts were to permit suits based solely upon the Tucker Act's statute of limitations without regard to congressional intent to "create[] a shorter statute of limitations for tax claims because 'suits against the United States for the recovery of taxes impeded effective administration of the revenue laws,'" then, the Supreme Court reasoned, "[t]he refund scheme in the current [IRC] would have 'no meaning whatever.'" Clintwood Elkhorn Mining Co., 128 S. Ct. at 1517 (quoting A.S. Kreider Co., 313 U.S. at 1347). Taxpayers, it emphasized, could simply circumvent the IRC's limitations provisions by invoking the longer, more forgiving statute of limitations provided by the Tucker Act. Id.

The Supreme Court recognized that "Congress has indeed established a detailed refund scheme that subjects complaining taxpayers to various requirements before they can bring suit. This scheme is designed 'to advise the appropriate officials of the demands or claims intended to be asserted, so as to insure an orderly administration of the revenue.'"[49] Id. at 1518 (quoting

---

[49] By enacting section 7422, Congress modified the tax refund structure that had previously been in existence, viz., the institution of a tax refund suit either against the United States or against the IRS district director "to whom the tax was paid" in the judicial district in which the taxpayer resided. S. Rep. No. 1625 (1966), reprinted in 1966 U.S.C.C.A.N. 3676, 3681. The Senate observed that

> [u]nder the present practice of filing returns and making payments of taxes to the 58 district directors, suits against collection officers are fairly widely dispersed throughout the judicial districts. . . .

United States v. Felt & Tarrant Mfg. Co., 283 U.S. 269, 272 (1931)).  Declining to address the coal companies' "gamely" argument that the Export Clause created a cause of action against the government that could be brought directly under the Tucker Act, the Supreme Court rejected such a contention outright: "We need not decide this question . . . because it does not matter."  Id. at 1517.  The argument mattered little, the Supreme Court asserted, because if "claims are subject to the [IRC] provisions, those claims are barred whatever the source of the cause of action."  Id. (emphasis added).

This pronouncement by the Supreme Court is clear: if the claim is encompassed by the IRC, then the limitations set forth in section 7422(a) apply.  Thus, addressing the coal companies' argument that "even if the refund scheme applies to Export Clause cases generally, it does not 'apply to taxes that are, on their face, unconstitutional,'" the Supreme Court reiterated that section 7422(a), with its broad language, is "the primary statute governing the refund process."  Id. at 1519.  Indeed, the Supreme Court explained–referring to an alternative, fallback argument asserted by the coal companies–that "[e]ven if we agreed that a facially unconstitutional tax for purposes of the tax refund scheme is 'merely in 'the guise of a tax,''" id. (quoting Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 7 (1962)), the reach of section 7422 nevertheless extends to "'any claim alleged to have been excessive or in any manner wrongfully collected,'" id. (quoting 26 U.S.C. § 7422(a)).  As such, the Supreme Court concluded that even if the coal companies were not illegally or erroneously assessed a tax, their claim would still comfortably fall within the broader "any sum" category such that they would be barred from initiating a suit absent filing an administrative refund claim.  See id.

---

. . . [T]hese suits against district directors, on occasion, have presented problems . . . .  For example, taxpayers have sued the current district director although his predecessor was the individual who collected the tax.  The predecessor district director may have passed away, or have moved from the judicial district necessitating the bringing of the suit in a different judicial district.  Sometimes the running of the statute of limitations bars taxpayers from bringing a second suit . . . .  Suits against district directors in some cases have also presented a problem for the [IRS].  Occasionally, taxpayers have thought that their cases would obtain more favorable action if brought in a judicial district other than the one of their residence and have therefore sued the district director where he resided in another juridical district, rather than the United States.  The bill prevents this attempt to find a more favorable judicial district . . . .

For the reasons given above[,] the bill adds a provision . . . which provides that suits for refund may be maintained only against the United States and not against an officer or employee of the United States.

1966 U.S.C.C.A.N. 3681-82.

Clintwood Elkhorn Mining Co. unequivocally concludes that the jurisdictional bar contained in section 7422(a) applies regardless of the underlying characterization of the claim because it reaches "'any sum alleged to have been excessive or in any manner wrongfully collected.'" 128 S. Ct. at 1519-20 (quoting 26 U.S.C. § 7422(a)). The court is bound by this determination. Plaintiff, however, attempts to distinguish Clintwood Elkhorn Mining Co. in order to claim that this holding is not applicable to the circumstances presented here. The court turns to these arguments, each of which is addressed below, and finds them unavailing.

### 6. The Court Declines to Adopt Plaintiff's Interpretations of Clintwood Elkhorn Mining Co.

As explained above, Clintwood Elkhorn Mining Co. unambiguously sets forth the rule that any claim that is subject to IRC provisions is also subject to the limitations provisions contained therein, viz., the requirement that an administrative refund claim must be initiated before a party may file suit in any court. Plaintiff advances three positions against the application of this rule. First, since Clintwood Elkhorn Mining Co. "repeatedly refers to Clintwood Elkhorn Mining Company as a 'taxpayer,'" Pl.'s Supp'l Mem. 7, plaintiff asserts that the IRC's "integrated tax refund scheme, which is applicable only to suits by taxpayers, does not apply" to it since plaintiff is not a taxpayer and arbitrage rebate is a non-tax amount. Id. at 9. Second, plaintiff suggests that a proper reading of Clintwood Elkhorn Mining Co. yields the following conclusion: its remittance "is either subject to the entire [IRC refund] scheme or it is not." Pl.'s Resp. Def.'s Supp'l Br. 9. Under this second interpretation, plaintiff claims that if the IRC's "entire tax refund scheme applies unless an exception exists for Plaintiff's remittance," Pl.'s Supp'l Mem. 10, then it has established the existence of an exception.[50] The court, however, does not find support for these contentions in Clintwood Elkhorn Mining Co. Arbitrage rebate is "subject to the [IRC] provisions," 128 S. Ct. at 1517, by virtue of section 148, which directs the Secretary to prescribe regulations that govern the recovery of overpayment of arbitrage rebate, see 26 U.S.C. § 148(i); Treas. Reg. § 1.148-3(i). Therefore, regardless of plaintiff's characterization arguments, section 7422, as stated in Clintwood Elkhorn Mining Co., governs.

Third, plaintiff emphasizes that Clintwood Elkhorn Mining Co. presented the Supreme Court "with a taxpayer who sought six years of tax refunds," three of which were statutorily barred by 26 U.S.C. § 6511(a). Pl.'s Resp. Def.'s Supp'l Br. 4 (emphasis added). Plaintiff generally asserts that since arbitrage rebate is not a tax, section 7422 cannot apply to its refund claim because the statute of limitations contained in section 6511(a) only applies to tax refund suits. In support of this position, plaintiff cites Radioshack Corp., wherein the Court of Federal

---

[50] Indeed, plaintiff hinges its argument upon the assertion that "[a]n exception does apply[:] Plaintiff's installment remittance of an estimated, unspecified amount of arbitrage rebate tax is properly treated as a refundable deposit of such amount," thereby not requiring the filing of an administrative refund claim prior to initiating a refund suit in the Court of Federal Claims. Pl.'s Supp'l Mem. 10 (citing Rosenman v. United States, 323 U.S. 658 (1945); N.Y. Life Ins. Co., 118 F.3d at 1553).

Claims explained that compliance with the time limitations set forth in section 6511(a) "'is a condition precedent for filing a refund suit in this Court under section 7422(a).'" Pl.'s Resp. Def.'s Supp'l Br. 7 (quoting 82 Fed. Cl. at 158). The Radioshack Corp. court explained that Clintwood Elkhorn Mining Co. "reaffirmed this principle," 82 Fed. Cl. at 158, noting further that additional precedent–both binding and persuasive–confirmed the interplay of sections 7422 and 6511, id. at 159-60.

The applicability of section 7422, however, is not absolutely dependent upon the applicability of section 6511. Section 6511 imposes a time limitation for filing a "[c]laim for credit or refund of an overpayment of any tax imposed by this title . . . ." 26 U.S.C. § 6511(a) (emphasis added). Its phrasing specifically applies to a "tax," which is encompassed by specific language in section 7422: "No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . ." Id. § 7422(a) (emphasis added). In Clintwood Elkhorn Mining Co., the Supreme Court discussed the interplay between these two sections because that case addressed a claim for the refund of a "tax."[51] The same was true in Radioshack Corp., which involved a claim for the credit or refund of an excise tax. There, the Court of Federal Claims relied upon prior Court of Claims precedent that emphasized "the overarching prohibition in section 7422 against maintaining any court action absent compliance with section 6511." 82 Fed. Cl. at 156.

Moreover, the two cases upon which Radioshack Corp. relied–Alexander Proudfoot Co. and J.O. Johnson, Inc.–both involved situations concerning the refund of a type of "tax" and not "any sum." In Alexander Proudfoot Co., the court addressed a refund claim for pre-notice interest paid on deficiencies in accumulated earnings tax, 454 F.2d at 1380, which the court "treated the same as the underlying tax for recovery purposes," id. at 1384, based upon Supreme Court precedent and the fact that the interest was "assimilate[d] . . . to the tax itself [by the IRC], so that the taxpayer who pays both . . . can and should proceed to seek to recover both together through one proceeding," id. at 1382. Furthermore, the Alexander Proudfoot Co. court rejected the plaintiff's contention that the "any sum" language of section 7422 did not apply to suits seeking the refund of interest paid on a deficiency, concluding that "[i]f plaintiff were right that a refund claim is unnecessary, the 'any sum' phrase in [26 U.S.C.] § 7422 would have minimal (perhaps no) coverage . . . ." Id. at 1384. The J.O. Johnson, Inc. court relied upon Alexander Proudfoot Co. in addressing "whether plaintiff's claim for the recovery of sums paid in satisfaction of an accumulated earnings tax is barred by plaintiff's failure to file a timely claim for refund." 476 F.2d at 1338 (emphasis added)). Although it acknowledged that "accumulated earnings tax is not the type of tax that is reported on the return," id. at 1340-41, the court

---

[51]   Indeed, defendant maintains that "the administrative refund claim filing deadlines set forth in [26 U.S.C.] § 6511(a) of the [IRC] apply only to taxes" and supports this position by noting that Revenue Procedure 2008-37 "establishes a separate deadline for filing an administrative refund claim for overpayments of arbitrage rebate . . . ." Def.'s Resp. Pl.'s 2d Supp'l Br. 3; see also I.R.S. Rev. Proc. 2008-37 (setting forth a two-year deadline after the final computation date for the filing of a refund claim for overpayment of arbitrage rebate).

nonetheless concluded that the tax at issue fell within the tax contemplated by section 6511(a), see id. at 1340-42.  Thus, these courts determined that sections 7422 and 6511 required timely filing of administrative refund claims because the underlying refunds involved assessed taxes.

While plaintiff maintains that section 6511 "applies broadly to include claims filed by a 'person who paid the tax' or is otherwise 'subject to' a tax," Pl.'s Supp'l Mem. 6 (quoting Williams, 514 U.S. at 532-36), nothing in these cases supports the contention that the administrative refund claim prerequisite set forth in section 7422 only applies in cases in which section 6511 is implicated, viz., claims for the credit or refund of an overpayment of a tax.  All of these cases involved refunds for tax, and such refunds fall squarely within the plain language of both sections 7422 and 6511.  Section 6511, of course, applies specifically to taxes and does not in any way implicate the broader category of claims to recover "any sum" within the meaning of section 7422.[52]  Moreover, none of these cases suggest that the IRC has established more than one "scheme" applicable to "tax" and "non-tax" amounts.  Cf. Pl.'s Supp'l Mem. 6 ("[T]he [IRC's] integrated tax refund scheme . . . applies broadly to all sorts of remittances made by persons (i.e., taxpayers) who have 'paid' or have been 'subject to' a tax.").

To summarize, the court determines that section 7422 applies to requests for refund of arbitrage rebate and that the Supreme Court's decision in Clintwood Elkhorn Mining Co. is directly applicable to the circumstances presented here.  Accordingly, plaintiff was required to seek an administrative refund prior to initiating suit in the Court of Federal Claims.  In light of this determination, the court need not address defendant's argument that failure to apply section 7422 to arbitrage rebate suits would create impractical results.[53]

---

[52]  Furthermore, section 6511 is not relevant here because the IRS has established the relevant procedure for an issuer to seek recovery of overpayment of arbitrage rebate.  See Rev. Proc. 2008-37, § 3.02, 2008-29 I.R.B. 137 (establishing a deadline of "no later than the date that is two years after the final computation date for the applicable issue of bonds").  Revenue Procedure 2008-37, together with Revenue Procedure 2006-40, which sets forth procedures for an issuer of tax-exempt bonds to request an administrative appeal from a denial for recovery of overpayment of arbitrage rebate, see Rev. Proc. 2006-40, 2006-42 I.R.B. 694, requires that an issuer must file a claim for refund with the Secretary, a requirement that comports with section 7422 and is consistent with the Supreme Court's determination in Clintwood Elkhorn Mining Co.

[53]  Defendant argues that 28 U.S.C. § 1346(a)(1), which waives the United States' sovereign immunity in federal district court, borrows language from the predecessor statute of section 7422(a).  Def.'s Mot. 17.  Because section 1346(a)(1) is strictly construed as a waiver of sovereign immunity, defendant maintains that if section 7422(a) did not apply to arbitrage rebate suits, then section 1346(a)(1), too, would not encompass arbitrage rebate actions.  Id.  Consequently, defendant argues, the federal district courts would be stripped of jurisdiction over arbitrage rebate suits under section 1346(a)(1), but not under section 1346(a)(2), the latter of which limits claims not greater than $10,000.00.  Id. at 17-18; see 28 U.S.C. § 1346(a)(2)

## C. The Court Rejects Plaintiff's Argument That Arbitrage Rebate Is a "Deposit"

Plaintiff next asserts that arbitrage rebate "should be treated as a deposit regardless of whether such remittance was a remittance of a tax or a remittance of a nontax amount subject to IRC [section] 7422." Pl.'s Am. Opp'n 31. It asserts that its remittance "was the first installment remittance of arbitrage rebate," id. at 18, argues that statutory exhaustion requirements are not applicable to deposits, Pl.'s Resp. Def.'s Supp'l Br. 3 (citing Rosenman, 323 U.S. at 658); accord Pl.'s Supp'l Mem. 10 (arguing that an exception to the IRC's "tax refund scheme" applies to refundable deposits), and claims that its remittance "is the classic example of a deposit":

> It was remitted in response to an IRS notice that did not specify an amount. It exceeded the amount estimated by Plaintiff as being "due." It was remitted to avoid penalties and interest (and lawsuits). And, it was remitted under protest. Plaintiff did not, in legal terms, "pay" rebate to the U.S[.] Government.

Pl.'s Resp. Def.'s Supp'l Br. 4. Plaintiff maintains that its deposit argument is supported by and "fully consistent with the case law . . . ." Pl.'s Am. Opp'n 19 (citing Cohen v. United States, 995 F.2d 205, 209 (Fed. Cir. 1993)). It notes that: (1) the June 26, 2006 jeopardy notice "did not specify a certain dollar liability,"[54] id. at 20; (2) the IRS never made an assessment or timely

---

(providing that the district courts, concurrent with the Court of Federal Claims, have original jurisdiction of "[a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort"). This result, defendant claims, would require issuers to "litigate their claims of greater than $10,000 exclusively in the Court of Federal Claims instead of in the district court of their residence. Surely that was not Congress'[s] intention in enacting the rebate provisions." Def.'s Mot. 18.

[54] In support of its contention that the June 26, 2006 jeopardy notice "did not specify the full amount of the 'tax' or 'sum liability,'" thereby rendering its payment a deposit, plaintiff states:

> [A]s the Flora doctrine requires full payment of all "sums" before filing suit for refund thereof, without deposit treatment, this refund action would be at risk of being . . . dismissed for failure to remit less than the full amount of the unspecified "sum" demanded by the Jeopardy Notice prior to bringing suit. Consequently, deposit analysis, by necessity, must apply to all remittances made under IRC [section] 7422 in order to properly apply the Flora doctrine.

Pl.'s Am. Opp'n 32 (footnote omitted). Yet, plaintiff also suggests that there is no reason "why the parties are even briefing this Court on the application of IRC [section] 7422 to amounts that the IRS does not assess as taxes" because Flora "discussed the requirement as one to pay the full

completed examination of its bond, id. at 20-21; and (3) plaintiff "remitted an amount in excess of the amount it computed as being due and owing," id. at 21; see also Pl.'s Resp. Def.'s Supp'l Br. 3 (contending that plaintiff may recover an overpayment pursuant to Treasury Regulation § 1.148-3(i)).  Because it believes that its remittance "conforms to existing case law, statutory law, IRS guidance, and IRS practice," Pl.'s Am. Opp'n 23, plaintiff asserts that the court should consider the remittance a deposit and exercise jurisdiction over its claim, see id. at 18-23; Pl.'s Resp. Def.'s Supp'l Br. 2-4.

Defendant, however, argues that "[u]nder plaintiff's deposit theory, the rebate required by Congress under [section] 148(f) would become a mere illusory payment that the Government must refund upon request of the issuer, even if the statute of limitations has expired" on the government's ability to declare the bonds taxable and assess tax against the bondholders.  Def.'s Reply 13.  It emphasizes that arbitrage rebate "is not assessable," id., and notes that nothing required the IRS to "to perform the 90 percent arbitrage calculation for plaintiff or to tell plaintiff the exact dollar amount that would equal the 90 percent due," id. at 14.  Furthermore, defendant asserts:

> [T]he most obvious flaw in plaintiff's "deposit" theory is that if plaintiff's rebate payment were accorded deposit treatment and were simply returned to plaintiff on demand, plaintiff's bonds would immediately become taxable arbitrage bonds under [26 U.S.C.] § 148(f) for failure to timely pay the required rebate, and plaintiff's bondholders would be liable for tax on the bond interest, retroactively to the date of issuance of the bonds.

Id. at 15.

In Dang v. Commissioner, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit")–in the context of a tax case wherein the taxpayers received a refund check from the IRS but did not negotiate the check, were subsequently assessed a tax deficiency for the refund amount plus interest by the IRS, and attempted to satisfy that deficiency by returning the refund check to the IRS–explained the difference between a "payment" and a "deposit":

> A taxpayer who is alleged to have a tax deficiency can either make a "payment" or "deposit."  A deposit can be for any amount up to and including the proposed liability.  The effect of a deposit is that it stops interest from accruing, may be withdrawn at any time, and preserves a taxpayer's right to petition the [United States] Tax Court.  A payment, on the other hand, evinces agreement with the IRS's proposed deficiency and indicates the taxpayer's consent to pay the proposed amount.  Generally, the taxpayer identifies the character of the remittance (payment or deposit).

amount assessed as tax" and the government indicates that the IRS "does not 'assess' arbitrage rebate as a tax."  Id. at 32 n.36.

259 F.3d 204, 206 n.2 (4th Cir. 2001).  While the <u>Dang</u> court addressed the assessment of tax rather than arbitrage rebate, the Fourth Circuit's characterization of a "deposit" is instructive. Indeed, plaintiff's remittance of arbitrage rebate was not a deposit.  First, plaintiff did not remit an amount "up to and including" the statutorily prescribed amount owed.  <u>See</u> 26 U.S.C. § 148(f)(3) (requiring that each installment of arbitrage rebate "be in an amount which ensures that 90 percent of the amount . . . with respect to the issue at the time payment of such installment is required will have been paid to the United States"); <u>accord</u> Pl.'s Am. Opp'n 18 ("Issuers are required to only remit 90 percent of arbitrage earned to the date of any installment computation period.").  Rather, plaintiff concedes that it "intentionally remitted 100 percent of this amount," contending that this "over-remittance is the straw that breaks the camel['s] back in favor of deposit treatment."  Pl.'s Am. Opp'n 21.  Plaintiff's remittance of an amount that exceeded the required ninety percent of its arbitrage profits does not transform its payment into a deposit.  Second, the June 26, 2006 jeopardy notice plaintiff received from the IRS required rebate of arbitrage profits within sixty days of the notice in order to retain the tax-exempt status of the bonds, and plaintiff made payment in order to preserve that status rather than to stop any accrual of interest.  As defendant notes, "[u]nlike in the tax context, the consequence of an issuer's failure to rebate arbitrage is not the imposition of penalties and interest, but is, rather, the loss of the privileged tax-exempt status of the bonds." Def.'s Mot. 24.  Third, plaintiff's remittance cannot be withdrawn at any time because doing so would convert its bonds into arbitrage bonds, which would impose liability upon the bondholders for tax on the bond interest.

Finally, plaintiff's argument that its rebate of arbitrage profits constituted a deposit because the June 26, 2006 jeopardy notice did not specify an amount owed, <u>see</u> Pl.'s Am. Opp'n 32 ("The Jeopardy Notice did not specify the full amount of the 'tax' or 'sum' liability . . . ."), is without merit.  Nothing in section 148(f) requires that the IRS calculate the amount of arbitrage rebate an issuer owes.  Rather, that duty rests with the issuer itself, which is instructed to make the calculations and payments according to the applicable regulations.  <u>See, e.g.</u>, Treas. Reg. § 1.148-3(c) (providing for the computation of future value of a payment or receipt); <u>id.</u> § 1.148-3(e) (indicating how an issuer may treat computation dates); <u>id.</u> § 1.148-3(f) (providing for the amount of required rebate installment payment that, "when added to the future value, as of the computation date, of the previous rebate payments made for the issue, equals at least 90 percent of the rebate amount as of that date").  Thus, it was plaintiff's responsibility, rather than the responsibility of the IRS, to calculate the amount of arbitrage profit.  Accordingly, the court declines to characterize plaintiff's payment of arbitrage rebate as a "deposit."

To summarize, plaintiff must, in order to recover an overpayment of arbitrage rebate in the Court of Federal Claims, first file a refund claim with the IRS pursuant to 26 U.S.C. § 7422(a).[55]  Since it failed to do so prior to filing suit, plaintiff cannot invoke the jurisdiction of

---

[55] The fact that plaintiff filed a refund claim after it initiated this action, <u>see</u> <u>supra</u> note 18, does not cure the jurisdictional defect.  Indeed, as defendant notes, the IRS cannot act upon plaintiff's claim because it has already been referred to the United States Department of Justice pursuant to 28 U.S.C. §§ 516, 519.  <u>See</u> Def.'s Reply 1 n.1

this court over its amended complaint.  As a result, defendant's RCFC 12(b)(1) motion is granted.

### D. Section 7422(a) Precludes the Court From Exercising Jurisdiction Over Plaintiff's Illegal Exaction Claim

Plaintiff alleges that its early remittance of arbitrage rebate constitutes an illegal exaction by the IRS.  Am. Compl. ¶ 38.  Specifically, plaintiff "alleges that Federal officials improperly compelled Plaintiff to remit moneys as arbitrage rebate pursuant to an act of Congress . . . and invalid Federal regulations."  Pl.'s Am. Opp'n 3.  It further asserts that "[t]here is also little doubt that arbitrage rebate may be treated as an exaction notwithstanding Congress's intent or purpose in imposing rebate requirements," id. at 12 n.15, and alleges that the IRS improperly demanded remittance of arbitrage rebate before it was due, see Am. Compl. ¶ 33 (alleging that plaintiff was harmed by the IRS's "demand for an early remittance of a disputed amount of arbitrage rebate"); see also Pl.'s Sur-Reply 19 (indicating that "[s]tate and local governments typically rebate the greatest amount of arbitrage earnings at the end of the first five-year rebate period").

As noted above, an illegal exaction claim is one "where the Government has the citizen's money in its pocket . . . ."  Clapp, 117 F. Supp. at 580; accord Eastport S.S. Corp., 372 F.2d 1002, 1007-08; see also Black's Law Dictionary, supra, at 581 (defining an exaction as "[t]he act of demanding more money than is due" or "[a] fee, reward, or other compensation arbitrarily or wrongfully demanded" (emphasis added)).  Here, plaintiff cannot maintain the assertion that the IRS demanded more money than was due because plaintiff acknowledges that it voluntarily remitted an amount that was greater than ninety percent of the amount due.  Indeed, it remitted 100 percent.  See supra note 14.  Since plaintiff cannot proceed on a theory that the IRS demanded more money than was due, plaintiff pursues the theory that the IRS wrongfully demanded payment of arbitrage profit by unlawfully accelerating the payment due date.  The Tucker Act permits claims "for recovery of monies that the government has required to be paid contrary to law."  Aerolineas Argentinas, 77 F.3d at 1572.  As such, plaintiff alleges that the IRS's regulations are "invalid as a matter of law" and that the IRS abused its discretion by wrongfully demanding an accelerated payment.  Am. Compl. ¶¶ 35, 37-38.  Plaintiff also accuses defendant of "fail[ing] to fulfill the pre-application requirement in [26 U.S.C.] § 7422 to provide regulatory guidance applying such provision to arbitrage rebate refund requests."  Pl.'s Am. Opp'n 33.

Returning to the Supreme Court's decision in Clintwood Elkhorn Mining Co., the law is settled that if a claim is encompassed by the IRC, then the limitations set forth in section 7422(a) apply.  See 128 S. Ct. at 1519.  Here, the Secretary, pursuant to 26 U.S.C. § 148(i), promulgated regulations authorizing an issuer to seek recovery of an overpayment for an issue of tax-exempt bonds.  See Treas. Reg. § 1.148-3(i); cf. Pl.'s Am. Opp'n 33 (stating that "the claim process for arbitrage rebate is not expressly required by statutory law or by regulation").  As the Federal Circuit noted, regulations "do not maintain an independent life . . . ."  Aerolineas Argentinas, 77 F.3d at 1575.  Thus, to the extent plaintiff claims that the IRS illegally exacted its arbitrage

rebate payment and that it is entitled to its return, see Am. Compl. ¶ 38 (alleging that the IRS's requirement that plaintiff provide "early remittance of a disputed amount, without any opportunity to refute, challenge[,] or contest key findings prior to the payment thereof," constitutes an illegal exaction), such a claim implicates the IRC generally and 26 U.S.C. § 7422(a) specifically.  See Rosenberg v. United States, 72 Fed. Cl. 387, 392 (2006) (determining that while the Court of Federal Claims possesses jurisdiction over a tax refund claim asserting that a tax was alleged to have been erroneously collected, the court lacked jurisdiction over the plaintiff's illegal exaction claim because she failed to "first file a claim for refund with the IRS" pursuant to section 7422(a)), aff'd, 223 Fed. App'x 985 (Fed. Cir.), cert. denied, 128 S. Ct. 724 (2007).  Section 7422(a), as discussed above, precludes a suit "for the recovery of . . . any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed . . . ."  26 U.S.C. § 7422(a) (emphasis added).  This provision, therefore, applies to plaintiff's claim that the IRS accelerated the due date of and "wrongfully collected" its rebate of arbitrage profits.  Since plaintiff's illegal exaction claim falls within the scope of 26 U.S.C. § 7422(a), which applies to the recovery of arbitrage rebate, plaintiff cannot invoke the court's jurisdiction over illegal exaction claims without first satisfying the requirements of section 7422(a).

Furthermore, plaintiff has not demonstrated that any statute or provision caused an exaction.  See Norman, 429 F.3d at 1095.  Plaintiff concedes that "the claim process for arbitrage rebate is not expressly required by statutory law or by regulation," Pl.'s Am. Opp'n 33, and merely asserts that it "held a property right in its trust fund moneys," id. at 34.  Plaintiff does not dispute that it is ultimately required to rebate arbitrage profits to the government in order to preserve the tax-exempt status of its bonds.  See Am. Opp'n 7 ("If a State or local governmental issuer fails or refuses to remit arbitrage, the IRS, as demonstrated by this case, compels the issuer to remit arbitrage by threatening to tax bondholders on interest received from their ownership of the bonds.").  Instead, it asserts that the Secretary unlawfully accelerated the due date for plaintiff's remittance.  As discussed in Part III.G, infra, the Secretary possesses the statutory authority to accelerate the timing of plaintiff's payment of arbitrage rebate.  See 26 U.S.C. § 148(f)(3); Treas. Reg. § 1.148-10(f).  Nothing in section 148(f)(3) or Treasury Regulation § 1.148-10(f) "provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  Norman, 429 F.3d at 1095 (quoting Cyprus Amax Coal Co., 205 F.3d at 1373).  For these reasons, the court lacks jurisdiction over plaintiff's illegal exaction claim.

**E.  The Court of Federal Claims Lacks Jurisdiction Over Plaintiff's Due Process Claims**

As discussed above, the Court of Federal Claims does not, with the exception of illegal exaction claims, possess jurisdiction over Fifth Amendment due process claims.  To the extent that plaintiff asserts separate allegations that its due process rights under the Fifth Amendment have been violated, see Am. Compl. ¶¶ 38-39; cf. Def.'s Reply 2 (stating that "[p]laintiff has apparently abandoned its 'due process' argument"), the court lacks jurisdiction to entertain these claims.

-44-

## F.  Plaintiff's Fifth Amendment Takings Claim

Plaintiff also alleges a Fifth Amendment takings claim, asserting that the IRS's requirement that plaintiff accelerate its payment of arbitrage rebate "constitutes a separate taking of plaintiff's property for public use without just compensation . . . ."  Am. Compl. ¶ 39.  The Supreme Court's decision in Clintwood Elkhorn Mining Co. forecloses plaintiff's ability to assert a Fifth Amendment takings claim in this case.  As discussed above, the Supreme Court rejected arguments from the coal companies that their cause of action could be maintained under the Export Clause, stating that if a claim is subject to provisions in the IRC, then that claim is "barred whatever the source of the cause of action."  128 S. Ct. at 1517.  Given this court's determination that 26 U.S.C. § 7422 encompasses arbitrage rebate, plaintiff's Fifth Amendment claim must be dismissed.  Nevertheless, the court addresses other reasons why plaintiff cannot assert a Fifth Amendment taking.

### 1.  Plaintiff Has Not Conceded the Legality of the Government's Action

Tucker Act jurisdiction over Fifth Amendment takings claims is premised upon the requirement that the government action was legitimate.  See Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 126-27 & n.16 (1974); Fla. Rock Indus., Inc. v. United States, 791 F.2d 893, 898-99 (Fed. Cir. 1986); see also Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1330 (Fed. Cir. 2006) ("[A] takings claim is separate from a challenge to the lawfulness of the government's conduct . . . .").  A plaintiff "must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act."  Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993).  Here, plaintiff alleges that "[s]ection 1.148-10(f) of the Income Tax Regulations is invalid as a matter of law . . . ."  Am. Compl. ¶ 35.  But see Pl.'s Am. Opp'n 34 (stating that plaintiff "assumes the correctness of Defendant's position on the legality of the Federal government's actions in issuing the Jeopardy Notice" only for the purposes of its takings claim, "but asserts . . . that the issuance of the notice and consequent remittance constituted a physical taking").  Consequently, the court lacks jurisdiction over plaintiff's takings claim to the extent that plaintiff disputes the lawfulness of the IRS's action.

### 2.  Even if Plaintiff Has Conceded the Legality of the Government's Action, It Fails to State a Claim Upon Which Relief Can Be Granted

Assuming, arguendo, that plaintiff has, in fact, conceded the validity of the IRS's action, see Pl.'s Sur-Reply 4 ("Regardless of the validity of the Jeopardy Notice, the enforced collection of Plaintiff's remittance . . . and IRS threats puts Plaintiff's remittance squarely within the definition of a 'tax.'"); see also Pl.'s Am. Opp'n 34 (arguing that "[s]olely for purposes of its alternative takings claim, Plaintiff assumes the correctness of Defendant's position on the legality of the Federal government's actions"), defendant maintains that plaintiff cannot establish a property right since "the payment of money as a condition imposed by the Government . . . cannot constitute a taking," Def.'s Reply 2.  But see Pl.'s Am. Opp'n 34 (arguing that the IRS's June 26, 2006 jeopardy notice "and consequent remittance constituted a physical taking that

deprived Plaintiff of property (i.e., its trust fund moneys) without just compensation"). Plaintiff acknowledges that "[t]here is no Constitutional right of the State or local government to issue tax free bonds." Pl.'s Am. Opp'n 4. Thus, plaintiff, like the plaintiff in Longshore v. United States, recognizes that it "has no preexisting right," 77 F.3d 440, 443 (Fed. Cir. 1996), to issue tax-exempt bonds. In Longshore, the plaintiff asserted, inter alia, a takings claim against the Federal Communications Commission ("FCC"), alleging that it participated in an FCC lottery for cellular radio licenses, paid inflated application fees to the FCC, and ultimately did not succeed in obtaining any licenses. Id. at 441-42. The Federal Circuit affirmed the dismissal of the takings claim, id. at 445, rejecting the argument that the plaintiff "was 'vested' with the statutory right to participate in the lottery once the lottery system was established . . . ." Id. at 443. It explained:

> [T]he Government had possession and control of access to the airwaves. That asset, if one wishes to call it that, did not belong to appellant or any other applicant, and no applicant had rights to use it until the FCC issued a proper license. Obtaining that license required participation in a publicly held lottery, for which an entry fee was charged. Congress set the fee, and the FCC collected it. Nothing in either takings law or tax law lends even remote support to appellant's cause.

Id. at 444.

Defendant suggests that the reasoning of Longshore is apposite here, see Def.'s Mot. 27-28; see also Def.'s Reply 2 ("The holding of Longshore is directly on point . . . ." (citations omitted)), and the court agrees. Plaintiff had no right to issue tax-exempt bonds, just as the Longshore plaintiff had no right to either participate in the FCC's lottery or obtain the radio licenses it sought. Plaintiff did so, however, pursuant to the IRC, which requires the payment of arbitrage rebate as a "condition with which an issuer must be willing to comply if it wishes to issue tax-exempt bonds." Def.'s Mot. 28. Plaintiff does not dispute "Congress's intent or purpose in imposing rebate requirements," Pl.'s Am. Opp'n 12 n.15, and recognizes that Congress "expanded the types of bonds subject to arbitrage rebate requirements," id. at 4. Notwithstanding plaintiff's claim that payment of arbitrage rebate is compulsory, see supra note 8, it is clear that plaintiff could have either fulfilled its statutory obligation to remit arbitrage rebate to the government or elected, in lieu of remitting arbitrage rebate, to lose the tax-exempt status of its bonds. Given this choice available to plaintiff, the government did not effect a taking of plaintiff's property.

Additionally, plaintiff cannot assert a "property right in its trust fund moneys."[56] Pl.'s Am. Opp'n 34. As defendant notes, "[t]he manner in which plaintiff may have held its money prior to payment, i.e., in a separate fund or otherwise, is irrelevant." Def.'s Reply 2. Moreover, it claims, plaintiff "mistakenly conflates decisional law granting relief under the takings clause where the claim is based on the confiscation of interest generated on a separate fund of money owned by the claimant," in which cases courts compensate "the owner of the principal where the interest generated by the principal has been taken." Id. at 2-3 (citing Phillips v. Wash. Legal Found., 524 U.S. 156, 165 (1998)). The Federal Circuit has determined that a takings claim "does not apply to legislation requiring the payment of money, Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1329 (Fed. Cir. 2001) (en banc), and "[r]equiring money to be spent is not a taking of property," Atlas Corp. v. United States, 895 F.2d 745, 756 (Fed. Cir. 1990). Therefore, plaintiff does not have a Fifth Amendment property right related to its payment of arbitrage rebate or any interest that might be generated therefrom.

### G.  The Court Cannot Review IRS Action Concerning the Acceleration of Plaintiff's Computation and Payment of Arbitrage Rebate Pursuant to the Administrative Procedure Act

Finally, plaintiff alleges that the IRS improperly accelerated its calculation and payment of arbitrage rebate, see Am. Compl. ¶¶ 24-33, 38-39, 41, and that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2006), "grants judicial review of all agency actions," Pl.'s Am. Opp'n 35. Defendant notes that plaintiff's "entire complaint is based on plaintiff's contention that the calculation and payment of arbitrage rebate was improperly accelerated." Def.'s Mot. 29; cf. Pl.'s Sur-Reply 16 ("In issuing the Jeopardy Notice, . . . Defendant both accelerated the time schedule for the remittance of arbitrage and increased the amount of the arbitrage rebate remittance from zero to $267,444.00, the amount calculated with the demanded adjustment."). It asserts that the court lacks jurisdiction to entertain the complaint because the Secretary possesses "unqualified discretion" to accelerate the calculation and payment of plaintiff's arbitrage rebate. Def.'s Mot. 29; accord Def.'s Reply 15 ("Congress conferred exclusive discretion on the Secretary to adjust the timing of rebate payments by issuers, and the Court may not substitute its own judgment for that of the Secretary in the exercise of that authority.").

As an initial matter, it is well-settled that the Court of Federal Claims lacks jurisdiction to review an agency's decision under the APA.  See, e.g., Martinez v. United States, 333 F.3d 1295,

---

[56] Plaintiff asserts that it held monies in trust funds that "were created solely from the proceeds of the Bonds under examination by the IRS. These trust fund moneys were being invested pending use to fund the purchase of homes for low-income residents." Pl.'s Am. Opp'n 34; accord Am. Compl. ¶¶ 11, 23. Plaintiff alleges that it used the monies in these funds to remit its arbitrage rebate to the government. Am. Compl. ¶ 26. It claims that these monies "were not fungible with other funds or amounts owned by Plaintiff" and that it "held a property interest in such funds." Pl.'s Am. Opp'n 35.

1313 (Fed. Cir. 2003) ("[T]he Court of Federal Claims lacks APA jurisdiction . . . ."); <u>Murphy v. United States</u>, 999 F.2d 871, 874 (Fed. Cir. 1993) ("[T]he Claims Court has no authority to invoke the APA."); <u>accord</u> <u>Lion Raisins, Inc. v. United States</u>, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005) ("Of course, no APA review is available in the Court of Federal Claims."). Thus, because the court cannot entertain actions based upon the APA, plaintiff cannot seek judicial review of the IRS's action on that basis. Even if plaintiff could invoke the APA, it does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

Outside the realm of the APA, the court lacks jurisdiction to review the Secretary's discretionary decision. Defendant maintains that the IRS's action fell within the agency's discretion, noting that Congress "has explicitly granted broad authority to the Secretary to promulgate 'such regulations as may be necessary or appropriate to carry out the purposes" of section 148. Def.'s Mot. 29 (quoting 26 U.S.C. § 148(i)); <u>see also</u> <u>id.</u> at 30 (relying upon <u>Williamsport Wire Rope Co. v. United States</u>, 277 U.S. 551 (1928), wherein the Supreme Court determined that the Commissioner's decision not to make a special assessment related to excess profits and war profits was not subject to judicial review).[57] It asserts that regulations promulgated by the Secretary pursuant to section 148 "are 'legislative' in character, having the force and effect of law." <u>Id.</u> (quoting <u>Batterton v. Francis</u>, 432 U.S. 416, 425 n.9 (1977)). Moreover, defendant emphasizes that Congress "places no limit on the Secretary's discretion," Def.'s Reply 16, particularly since section 148(f)(3) provides: "<u>Except to the extent provided by the Secretary</u>, the amount which is required to be paid to the United States by the issuer shall be paid in installments which are made at least once every 5 years." 26 U.S.C. § 148(f)(3) (emphasis added). Defendant notes that the broad discretion accorded the Secretary in section 148(f)(3) enables the Secretary to "give greater leeway than is provided by the statutory default" or, possibly, to "require an issuer to pay over its arbitrage profits more frequently than once every five years." Def.'s Reply 16.

The discretion accorded to the Secretary in section 148(f)(3) is, in fact, not limited. Whereas section 148(f)(7) expressly limits the Secretary's discretion to allow issuers to pay a penalty in lieu of the loss of tax exemption if specific requirements are satisfied, <u>see</u> 26 U.S.C. § 148(f)(7)(A)-(C), similar limits are absent from section 148(f)(3). As the Federal Circuit acknowledged in <u>Murphy v. United States</u>, "judicial review is only appropriate where the

_____

[57]  Plaintiff maintains that the circumstances in <u>Williamsport Wire Rope Co.</u> are distinguishable, stating that the Supreme Court confronted a "unique situation," which it then contrasted with "more typical situations involving 'problems requiring a high degree of technical knowledge for their solution . . . .'" Pl.'s Am. Opp'n 36 (quoting <u>Williamsport Wire Rope Co.</u>, 277 U.S. at 560). It emphasizes that unlike the Supreme Court in <u>Williamsport Wire Rope Co.</u>, which addressed "the situation of a large group of taxpayers," 277 U.S. at 561, the court need only concern itself with "a single 'taxpayer.'" Pl.'s Am. Opp'n 36. Nevertheless, the Supreme Court accorded the IRS's "wide experience in such matters and ready access to the means of information" in determining that the agency enjoyed discretion under the circumstances presented in that case. <u>Williamsport Wire Rope Co.</u>, 277 U.S. at 561.

Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct.  Unless such a test or standard is provided, courts must abstain."  993 F.2d 871, 873 (Fed. Cir. 1993) (citation omitted).  Congress "may deprive this court of jurisdiction to review a discretionary act when it does so expressly, and within the framework of its constitutionally delegated powers."  Fattore v. United States, 312 F.2d 797, 802 (Ct. Cl. 1963).  Here, section 148(f)(3) is unambiguous, and the provision does not limit the Secretary from accelerating the timing of plaintiff's payment of arbitrage rebate.  The court, absent an express limitation, cannot infer that such a limitation exists.  See Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").  Therefore, the court cannot review the IRS's discretionary action to accelerate plaintiff's calculation and payment of arbitrage rebate.

In short, the court lacks jurisdiction to entertain plaintiff's amended complaint on grounds that the Secretary's action–accelerating plaintiff's payment of arbitrage rebate–is subject to judicial review.

## IV.  CONCLUSION

For the reasons set forth above, it is hereby ordered:

1.  Defendant's Motion to Dismiss, filed pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction, is **GRANTED**.  The Clerk of Court is directed to dismiss plaintiff's amended complaint **WITHOUT PREJUDICE** and to enter judgment accordingly.

2.  Defendant's Motion to Dismiss, filed pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted, is **DENIED AS MOOT**.

No costs.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge